**UNITED STATES of America, Appellee,**

v.

**Solomon WEISS, Defendant-Appellant.**

**No. 1481, Docket 84–1103.**

United States Court of Appeals,
Second Circuit.

Submitted July 17, 1984.

Decided Jan. 7, 1985.

Nathanial H. Akerman, Sp. Asst. U.S. Atty., for S.D.N.Y., New York City (Rudolph W. Giuliani, U.S. Atty., for S.D.N.Y., New York City, of counsel), for appellee.

Leon Silverman, New York City (Gregory P. Joseph, Linda R. Brower, Fried, Frank, Harris, Shriver & Jacobson, New York City, of counsel), for defendant-appellant.

Before NEWMAN and PRATT, Circuit Judges, and KELLEHER,* District Judge.

KELLEHER, Senior District Judge.

Solomon Weiss appeals from a judgment of conviction in the United States District Court for the Southern District of New York, Mary J. Lowe, J., entered on March 13, 1984, after a jury trial. Weiss was found guilty of three counts of mail fraud, 18 U.S.C. § 1341, three counts of perjury, 18 U.S.C. § 1623, and one count of racketeering under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962. Weiss asserts on appeal several grounds for reversal: (1) that he was denied a fair trial because of the infiltration of extra-record evidence into the jury deliberations; (2) that the government's theory and proof at trial constituted a constructive amendment of the indictment; (3) that the government failed to establish that the defendant's conduct violated the mail fraud or RICO statutes; (4) that the prosecutor's use of leading questions to present the testimony of the two key prosecution witnesses to the grand jury violated his Fifth Amendment rights; (5) that his perjury conviction should be reversed because of the prosecution's failure to disclose a known conflict of interest or defendant's "target" status at the time of his grand jury testimony; and (6) that the District Court erred by not submitting to the jury the issue of the materiality of his perjurious grand jury testimony to the jury.

We affirm on all counts.

Solomon Weiss ("Weiss") was tried under a thirteen count indictment on charges of mail fraud, perjury, racketeering, and tax fraud.

After three weeks of trial and four days of deliberation, the jury found Weiss guilty of seven of the thirteen counts charged in the indictment. Specifically, Weiss was convicted of: (1) one violation of the RICO Act, 18 U.S.C. § 1962(c); (2) three violations of mail fraud, under 18 U.S.C. § 1341; and (3) three perjury violations, under 18 U.S.C. § 1623. Weiss was acquitted of one count of mail fraud and of four counts of tax fraud, 26 U.S.C. § 7206(2).

By various post trial motions, defendant asserted each of the contentions here presented, including alleged contamination of the jury. After an extensive hearing on the prejudicial effects of this alleged contamination, the District Judge ruled that the jury had ample independent evidence to convict Weiss and denied that motion. Additionally, all of the defendant's post trial motions were denied. ·

* The Honorable Robert J. Kelleher of the United States District Court for the Central District of California, sitting by designation.

On March 13, 1984, Weiss was sentenced to concurrent five-year terms of probation. As part of his conviction under the RICO Act, Weiss was ordered to disgorge 14,898 shares of Warner Communications, Inc. ("Warner") common stock and 359 Warner warrants, valued at approximately $412,000. Finally, Weiss was fined a total of $58,000.

The principal question before the jury was the relatively narrow issue as to which side proved more believable. The government presented testimony of Leonard Horowitz ("Horowitz") and Jay Emmett ("Emmett") that Weiss had arranged for illicit cash rebates to flow from various stock purchases and from false invoices. The evidence revealed that Weiss had taken this cash and created a secret cash fund, and had forged documents to disguise the existence of this fund. The defense put great emphasis on the lack of credibility of Horowitz and Emmett. The jury found in favor of the government upon substantial supportive evidence.

### The First Stock Purchase Transaction

In 1972 Horowitz became involved in a plan to establish a live entertainment theater, the Westchester Premier Theatre ("WPT" or "Theatre"). In May and June of 1973, WPT conducted an initial public stock offering in order to raise capital. The stock sold sluggishly so Horowitz offered secret inducements to select purchasers of WPT shares.

Horowitz approached Emmett, a close friend and Vice President of Warner, and offered him 10,000 shares of WPT for $75,000. Emmett chose to decline, but went to Steven Ross, Chairman of the Board of Warner, with the offer. Ross responded that Weiss, at that time the Assistant Treasurer for Warner, might be interested in the transaction. Emmett introduced Weiss to Horowitz, who then proposed the same deal. Weiss proposed a counteroffer where Warner would buy 20,000 shares of WPT stock for $150,000 if WPT would "kick back" $100,000 to Warner. Pursuant to this arrangement, Horowitz gave Weiss $50,000 in cash on the spot and promised to pay Weiss $50,000 at a later date.

Approximately one month later the agreement was modified because WPT was unable to produce an additional $50,000 in cash, the amount owed under the original agreement. Weiss agreed to issue $50,000 in Warner checks to Horowitz in exchange for $20,000 in cash. Weiss directed Horowitz to prepare a false, back-dated invoice, purportedly from Dennis Konner ("Konner"), an attorney, to make it appear that legal services had been performed.

### The Second Stock Purchase Transaction

In July of 1973, Horowitz and Weiss entered into a second stock purchase agreement. Under the terms of this new transaction, Warner was to purchase an additional 20,000 shares of WPT stock for $100,750 and, in exchange, receive a $100,000 rebate when the theater opened in early 1974. WPT's plans to open in early 1974 fell through and Horowitz renegotiated the deal with Weiss. Weiss and Horowitz devised a new scheme to garner cash for the fund. Between 1974 and 1977, Weiss would induce Warner to issue ten checks to Horowitz, and then Horowitz would deliver increments of the $100,000 debt to Weiss. Using various modes of operations, Warner issued ten bogus checks totalling $171,950 and Horowitz returned $100,000 in cash to Weiss. To make these payments appear legitimate, Weiss created false documents in Warner's accounting system and had a plagiarized report created and filed with Warner.

In sum, Warner paid out over $470,000 for non-performed services and for stock of questionable value. In return, Weiss received $170,000 in cash and 40,000 shares of WPT stock, which cost about $250,000. On paper, Warner's net loss stood at approximately $50,000.

### The Basis for the Perjury Charges

After Horowitz received a letter from Weiss, of October 23, 1973, he prepared the Konner bill for unperformed legal services and back-dated it to July 11, 1973. The bill, filed with Warner bears the signature "J. Emmett." At trial, a handwriting expert

identified the Emmett signature as written by Weiss. Other experts testified that the signature on the Konner bill was not the signature of Jay Emmett.

At trial Weiss testified that he wrote the October 23 letter prior to realizing that Warner had received the bill. Weiss also claimed that Emmett had directed him to issue a $30,000 check to Konner. Further, Weiss contended that Emmett had instructed him to write to Konner in order to obtain the bill for legal services performed by Konner's firm while working on different deals for Warner. Yet on April 10, 1978, in an appearance before a grand jury, Weiss's testimony contained certain contrary statements. There, Weiss claimed that he had prepared the July 26, 1973 check based directly on the Konner bill of July 11, 1973. Additionally, Weiss denied that Horowitz and the Konner bill were in any way connected. The indictment charged that several of Weiss's statements to the grand jury were perjurious. Substantial evidence, including Weiss's contradictory trial testimony, support these allegations.

Except for his contention that a constructive amendment of the indictment occurred, we find little merit in appellant's contentions. We shall discuss first the lesser grounds before proceeding to consideration of the more substantial issue of whether there existed error in any variation between the charges made and the proof offered by the government.

*The Contamination of the Jury*

In May of 1983 counsel for the appellant renewed a motion for a new trial, claiming that extra-record evidence had been presented to the jury during their deliberations and that such information may well have contaminated these deliberations. The District Court conducted a hearing on the matter and discovered that information from a standard set of accounting textbooks not received in evidence had found its way into the jury deliberations.

At a hearing before the District Court it appeared that, after the presentation of the evidence but prior to the deliberations, one juror had reviewed a basic text on bookkeeping. He testified that he had read to the jurors an excerpt from the textbook that explained the responsibilities and training of CPA's as distinguished from bookkeepers.[1] The court questioned a total of ten jurors, each of whom remembered, with various levels of specificity, the discussion. The court determined that after the textual excerpt was brought up in the discussion, the jury moved on to other matters. After extensive review of this issue, the District Court ruled that the appellant's motion for a new trial should be denied.

Appellant contends that the District Court erred in denying his motion for a new trial. He asserts that his status as a CPA was essential to the jury's determination of what he knew about the ventures, and he contends that this knowledge proved to be critical on the issue of his guilt or innocence. Because the record contained no evidence concerning the duties of a CPA, the appellant argues that the infiltration of textbook definitions into the deliberations deprived him of a fair trial. Specifically, Weiss asserts that the contamination of the jurors by the injection of extra-record evidence fatally prejudiced him in violation of his Fifth Amendment rights to due process and his Sixth Amendment right of confrontation and cross-examination.

■ We have recognized that "extra-record information that comes to the attention of a juror is 'presumptively prejudi-

---

1. One of the jurors had recited the following textual passages to the other jurors:

*Certified public accountants* are independent professional persons comparable to attorneys or physicians, who offer accounting services to clients for a fee. The *CPA certificate* is a license to practice granted by the state on the basis of a rigorous examination and evidence of practical experience. All states require that candidates pass an examination prepared and administered on a national basis twice each year by the American Institute of Certified Public Accountants.

W. Meigs & R. Meigs, *Financial Handbook* 7 (3d ed. 1979) (emphasis in original).

cial.'" *United States v. Hillard,* 701 F.2d 1052, 1064 (2d Cir.), *cert. denied,* 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1318 (1983) (citing *Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654, 656 (1954)). This presumption may be rebutted, however, by an affirmative showing on the part of the government that the information was harmless. *Id.* "The touchstone of decision in a case such as we have here is thus not the mere fact of infiltration of some molecules of extra-record matter, ... but the nature of what has been infiltrated and the probability of prejudice." *United States ex rel. Owen v. McMann,* 435 F.2d 813, 818 (2d Cir.1970), *cert. denied,* 402 U.S. 906, 91 S.Ct. 1373, 28 L.Ed.2d 646 (1971) (citations omitted).

■ The trial court should assess the "possibility of prejudice" by reviewing the entire record, analyzing the substance of the extrinsic evidence, and comparing it to that information of which the jurors were properly aware. *Sher v. Stoughton,* 666 F.2d 791, 794 (2d Cir.1981). The court may properly conclude that such extra-record information was non-prejudicial if it determines that an abundance of properly admitted evidence relevant to this matter exists. *Hillard, supra,* at 1064; *Sher, supra,* at 793–94.

■ Additionally, the trial court has broad discretion in reviewing the issue of the prejudicial effect of the infiltration of extra-record evidence into the deliberations of the jury. *Marshall v. United States,* 360 U.S. 310, 312, 79 S.Ct. 1171, 1173, 3 L.Ed.2d 1250, 1252 (1959); *United States v. Panebianco,* 543 F.2d 447, 457 (2d Cir. 1976), *cert. denied,* 429 U.S. 1103, 97 S.Ct. 1129, 51 L.Ed.2d 553 (1977); *United States v. Flynn,* 216 F.2d 354, 372 (2d Cir.1954),

*cert. denied,* 348 U.S. 909, 75 S.Ct. 295, 99 L.Ed. 713 (1955). "[A] trial judge's handling of alleged juror misconduct or bias is only reviewable for abuse of discretion." *Panebianco, supra,* at 457.[2]

■ After an exhaustive evidentiary hearing on the issue of jury contamination, the trial judge concluded that the infiltration of the material from an accounting text into deliberations of the jury was harmless. We find no abuse of discretion in so holding. *See United States v. Hockridge,* 573 F.2d 752, 756 (2d Cir.1978).

*The Sufficiency of Proof of Mail Fraud*

Appellant argues that his participation in the creation of a cash fund does not constitute a fraud in violation of the mail fraud statute[3] nor of RICO. Appellant contends that there was no evidence at trial that any cash was misappropriated from Warner. He alleges that the cash fund theory conjured up by the government contemplated neither harm nor injury to Warner or to its stockholders, nor involved the use of the cash fund for any improper purpose. The appellant claims that the corporate cash fund was presumptively used for the benefit of the corporation, thereby defeating any obligation to disclose to the stockholders the creation of the cash fund. Finally, the appellant argues that the mail fraud statute applies only when a party personally benefits from the misappropriation of funds.

■ An employee's breach of a fiduciary duty, standing alone, will not support a mail fraud violation. Rather, the government must also prove that while under a duty to disclose material information to his employer, an employee failed to do so. *United States v. Barta,* 635 F.2d 999, 1006

---

**2.** The Ninth Circuit has aptly noted:

The trial judge is uniquely qualified to appraise the probable effect of information on the jury, the materiality of the extraneous material, and its prejudicial nature. He or she observes the jurors throughout the trial, is aware of the defenses asserted, and has heard the evidence. The judge's conclusions about the effect of the alleged juror misconduct deserves substantial weight.

*United States v. Bagnariol,* 665 F.2d 877, 885 (9th Cir.1981), *cert. denied,* 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982).

**3.** Section 1341 prohibits "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretense or promises." 18 U.S.C. § 1341 (1976).

(2d Cir.1980), *cert. denied,* 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981). Thus, the statute is violated when a fiduciary fails to disclose material information "which he is under a duty to disclose to another under circumstances where the non-disclosure *could* or *does* result in harm to another." *United States v. Siegel,* 717 F.2d 9, 14 (2d Cir.1983) (quoting *United States v. Bronston,* 658 F.2d 920, 926 (2d Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982) (emphasis added).

■■■ While the government must show that some harm or injury was contemplated by the scheme, it need not show that "direct, tangible economic loss resulted to the scheme's intended victims." *Siegel, supra,* at 14; *see United States v. Newman,* 664 F.2d 12 (2d Cir.1981), *cert. denied,* — U.S. ——, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983). Violations of the mail fraud statute may be based on artifices which do not deprive any person of money or other forms of tangible property. *United States v. Margiotta,* 688 F.2d 108, 121 (2d Cir.1982), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983). Further, the government need not prove that the fraudulent actors actually benefited from their deception. *Id.*

■■■ Appellant's argument that he did not violate the mail fraud statute because his creation of the cash fund was not illegal, was not intended to harm Warner or its shareholders, and did not lead to any personal gain presents a close question. We have held, however, that there need not be a direct showing that the wrongful act was harmful, *per se,* to the corporation. *Siegel, supra.* In *Siegel,* two executive officers were charged with violations of the wire fraud statute, 18 U.S.C. § 1343 (1976), because of their participation in the creation of a cash fund. The scheme involved unrecorded cash sales of merchandise that had been closed out, marked down for clearance, or returned as damaged. The indictment charged the defendant with creating the illicit fund in order to bribe union officials and to increase personal coffers. *Id.* at 10–11.

In *Siegel* defendants defrauded the corporation and its shareholders by deliberately concealing and by failing to account for the sales of all corporate property and merchandise. The government theorized that such acts by top corporate officers defrauded the corporation and its shareholders, and violated the executives' fiduciary duty to act honestly and faithfully. *Id.* at 13.

Attempting to distinguish *Siegel,* Weiss argues that the government presented no evidence that the Warner cash fund was actually used for his own personal enrichment. Weiss contends that without such an affirmative showing by the government, he cannot be convicted of a mail fraud violation. Weiss, however, misunderstands the scope of *Siegel.*

The reviewing court was satisfied with the evidence proffered by the government: a misappropriation of corporate funds coupled with the use of such funds for a non-corporate purpose. The government presented evidence that Siegel and Abrams had pocketed some of the funds and had used other amounts to bribe union officials. The court noted, however, that there was "little, if any, direct evidence to show that Siegel and Abrams used the cash proceeds for other than corporate purposes...." *Id.* at 15. Yet, the court determined that there was "sufficient evidence from which the jury could reasonably have concluded that the defendants received the cash proceeds and used them for non-corporate purposes in breach of their fiduciary duties" and in violation of the wire fraud statute. *Id.* at 14.

Our case is within the ambit of the holding in *Siegel.* There is no requirement that the government prove that the misappropriated funds were used by Weiss for his own enrichment. Rather, evidence of a non-corporate purpose, explicitly or implicitly derived, will satisfy the requirements of *Siegel.* There was no direct evidence offered concerning the final destination of the misappropriated funds. However the jury could reasonably have concluded that the disbursement of corporate funds for fake feasibility studies and fake invoices for

non-rendered services established non-corporate use of the funds. Indeed the record here, as in *Siegel*, allowed the jury to "have drawn a justifiable inference that defendants used the scheme for their own benefit." *Id.* at 15. With the evidence presented here, a jury could, at the very least, infer that the diversion of corporate funds by Weiss was for a non-corporate purpose. This is sufficient to bring the case within the holding in *Siegel*.

 Weiss formulated an elaborate plan, involving phony cash-generating transactions, to disguise the fund from the shareholders at Warner. He created fake feasibility studies and bogus tasks for real estate "consultants," issued checks for non-performed legal services, and purchased large amounts of speculative stock. The District Court found that the scheme to create a cash fund via the acceptance of kickbacks, the conversion of corporate assets into non-performed services, and the creation of false and fraudulent documents to conceal and disguise these illicit transactions were unquestionably acts of fraud on the corporation. We agree with this finding.

 The appellant's remaining duo of contentions against his conviction under the mail fraud statute can be readily dispatched. First, Weiss claims that he was not an "officer" of Warner, thus owing no duty to disclose the cash fund to the shareholders. On review of the record, this assertion cannot be taken seriously. Finally, Weiss contends that he was acting under the direction, and with the approval, of his superiors. Consequently, he asserts that no conflict between his fiduciary duty to his employer and his participation in the cash fund scheme arose. Once more, the District Court properly rejected this argument, noting that regardless of the fact that higher officials directed the wrongful acts, the harm was no less injurious to the corporation. *See Goldberg v. Meridor*, 567 F.2d 209, 217 (2d Cir.1977).

In sum, appellant's attempts to distinguish the facts of his case from the law of mail fraud fails on all counts.

*Prosecutorial Misconduct*

Appellant seeks reversal of his conviction for perjury because the prosecution failed to disclose to him: (1) a known conflict of interest concerning the defense counsel that Warner had retained for him at the grand jury proceedings; and, (2) his status as a target of a government investigation. Weiss claims that this misconduct effectively deprived him of his Sixth Amendment right to representation of counsel of "undivided loyalties."

The same law firm represented both Warner and those Warner executive officers, including Weiss, subpoenaed to testify before the grand jury in 1978. Counsel advised each executive to cooperate with the investigation while in front of the grand jury. U.S. Attorneys knew that Weiss was under separate investigation for defrauding Warner, and chose not to inform counsel for defendant of this. Special Assistant U.S. Attorney Akerman feared that such a disclosure might compromise the ongoing investigation and could possibly endanger a government informant who had been wired for sound and had participated in a number of the illicit transactions.[4]

 In a separate opinion, the District Court determined that Weiss's perjurious testimony before the grand jury should not be suppressed. We affirm the holding of the lower court. A "witness sworn to tell the truth before a duly constituted grand jury will not be heard to call for the suppression of false statements to the jury...." *United States v. Mandujano*, 425 U.S. 564, 582, 96 S.Ct. 1768, 1779, 48 L.Ed.2d 212, 226 (1976).

 It is not at all clear that the prosecution misrepresented Weiss's "target" status to his defense counsel. Even if the actions of the U.S. Attorneys can somehow be construed as "misconduct," such actions did not cause sufficient prejudice to Weiss

---

**4.** *United States v. Weiss*, Mem.Op., No. 81–636, at 29 (August 10, 1982).

to warrant the dismissal of his perjury conviction. *See id.* at 577, 96 S.Ct. at 1776–77, 48 L.Ed.2d at 222–23.

■ If the appellant's claim for suppression of his grand jury testimony is predicated upon a violation of the Disciplinary Rules, this review rests within the supervisory power of this Court. *See United States v. Foley,* 735 F.2d 45, 48 (2d Cir.1984); *United States v. Jamil,* 707 F.2d 638, 645–46 (2d Cir.1983); *see also United States v. Thomas,* 474 F.2d 110, 112 (10th Cir.), *cert. denied,* 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160 (1973). The failure of Special Assistant U.S. Attorney Akerman to seek judicial resolution of the known conflict of interest of defendant's attorney was not motivated by bad faith or in deliberate disregard of an ethical obligation. The lower court found it inappropriate to sanction his behavior. We see no reason to disturb that determination.[5]

■ We must also reject the appellant's claim under constitutional principles for the suppression of his perjurious testimony. It is now well settled that a witness before a grand jury may not dismiss an indictment for perjury because he was the target of an investigation, *United States v. Dionisio,* 410 U.S. 1, 10 n. 8, 93 S.Ct. 764, 769 n. 8, 35 L.Ed.2d 67, 77 n. 8 (1973); or because he was not advised of his *Miranda* rights, *United States v. Mandujano,* 425 U.S. 564, 577, 96 S.Ct. 1768, 1776–77, 48 L.Ed.2d 212, 222–23 (1977); or because no effective warning of the Fifth Amendment privilege to remain silent was given, *United States v. Wong,* 431 U.S. 174, 179–80, 97 S.Ct. 1823, 1826, 52 L.Ed.2d 231, 236–37 (1977). *See also United States v. Washington,* 431 U.S. 181, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977).

*The Use of Leading Questions*

■ We perceive no error in the prosecution's use of leading questions before the grand jury. *See United States v. Jacobson,* 691 F.2d 110, 115–16 (2d Cir.1982).

*See also United States v. Provenzano,* 440 F.Supp. 561, 565–66 (S.D.N.Y.1977).

*Materiality of Perjurious Testimony as a Jury Issue*

■ Weiss's claim that the District Court erred in not submitting the issue of the materiality of his perjurious testimony to the jury is foreclosed by the law of this circuit. It is well settled that the materiality of perjury before a grand jury is a question for the court alone. *United States v. Moon (Sun Myung),* 718 F.2d 1210, 1237 (2d Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984); *United States v. Cunningham,* 723 F.2d 217, 226 (2d Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2154, 80 L.Ed.2d 540 (1984); *United States v. Berardi,* 629 F.2d 723, 728 (2d Cir.), *cert. denied,* 449 U.S. 995, 101 S.Ct. 534, 66 L.Ed.2d 293 (1980).

*The Constructive Amendment of the Appellant's Indictment*

The appellant claims that his conviction on the mail fraud and RICO counts should be reversed because the government's theory and proof at trial "radically departed" from the charging terms of the indictment. Specifically, Weiss argues that the "plain import" of the indictment suggests that he was charged with fraudulently concealing from Warner shareholders his acceptance of bribes and his conversion of corporation assets, personally enriching himself at the shareholders' expense. Weiss contends that the government abandoned this theory at trial and adopted a "cash fund" theory, accusing Weiss of breaching his fiduciary duties to Warner shareholders by fraudulently accepting cash on Warner's behalf. The appellant claims that the great discrepancy between the government's "breach of duty" theory at trial and the indictment's "bribe and conversion" theory violated his Fifth Amendment rights by precluding the jury from convicting him on the offense for which he was indicted. Further, the appellant argues that his lack of knowledge con-

5. *Id.* at 28–32.

cerning the cash fund theory until trial severely prejudiced his timely preparation of an adequate defense.

The government argues that the cash fund evidence presented at trial matched the proof placed before the grand jury. The government contends that this consistent presentation refutes the appellant's allegation of shifting theories. Further, the government asserts that statements in a bill of particulars ten months prior to trial refute Weiss's claim that he was surprised by the cash fund theory at trial. Finally, the government argues that Weiss waived any "variance of theories" claim because he failed to object to any cash fund evidence or related instructions at any time during the proceedings.

■ A criminal defendant has a substantive right to be tried only on the charges contained in the indictment returned by the grand jury. *Ex parte Bain*, 121 U.S. 1, 7, 7 S.Ct. 781, 784–85, 30 L.Ed. 849, 852 (1887); *Stirone v. United States*, 361 U.S. 212, 216–17, 80 S.Ct. 270, 273, 4 L.Ed.2d 252, 256 (1960).

■ "An *amendment* of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, ... [while a] *variance* occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *United States v. Pelose*, 538 F.2d 41, 45 n. 8 (2d Cir.1976) (quoting *Gaither v. United States*, 413 F.2d 1061, 1071 (D.C.Cir.1969)) (emphasis in original). While variances are subject to the harmless error rule and require a showing of prejudice to the defendant, *United States v. Garguilo*, 554 F.2d 59 (2d Cir.1977), constructive amendments are generally considered prejudicial *per se*. *See United States v. Crocker*, 568 F.2d 1049, 1060 (3d Cir.1977); *United States v. Beeler*, 587 F.2d 340, 342 (6th Cir.1978), *cert. denied*, 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981).

There is considerable confusion as to what constitutes a constructive amendment

of an indictment as opposed to a variance of an indictment. *Stirone v. United States, supra,* is the case most often cited by defendants arguing either that a constructive amendment or a variance of the indictment occurred; yet *Stirone* does not specifically address this distinction. The definition noted above has been set forth in the decisions of several circuits, including this circuit.

The appellant contends that the rule against a variance or a constructive amendment of an indictment has been frustrated by the government. *See generally United States v. Lemire*, 720 F.2d 1327 (D.C.Cir. 1983), *cert. denied*, ── U.S. ──, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984); *United States v. Beeler, supra; United States v. Silverman*, 430 F.2d 106, 111 (2d Cir.1970), *cert. denied*, 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971). We reject this contention, and find that both the government's theory and the proof offered at trial fairly reflect the charges set forth in the indictment.

■ A defendant is deprived of his right to be tried only on the charges returned by a grand jury if the prosecution's proof or theory constitute a modification at trial of an *essential element* of the offense charged. *See Lemire*, 720 F.2d at 1345; *Watson v. Jago*, 558 F.2d 330, 334 (6th Cir.1977); *Silverman*, 430 F.2d at 100.

■ In this case the indictment charged that Weiss "did secretly and corruptly extract and accept cash bribes ... [and] caused Warner to purchase common stock in the Westchester Premiere Theatre ..., thereby violating [his] fiduciary duties to Warner and its shareholders to provide honest and faithful services, undivided loyalty and to perform [his] executive obligations in good faith and exclusively in the best financial interest of Warner and its shareholders."

The indictment also charged Weiss with "secretly and corruptly siphon[ing] and convert[ing] approximately $221,950 in checks which belonged to Warner and its shareholders ...," and with knowingly

causing "fraudulent documents to be prepared" in order to make it "appear that the checks ... were being paid to third parties for services rendered to Warner" when in fact Weiss knew "said services were non-existent."

Finally, Weiss is charged with "having devised a scheme and artifice to defraud Warner and its shareholders and [with] obtaining money from Warner and its shareholders by means of false and fraudulent pretenses, representations and promises, unlawfully, wilfully and knowingly ... for the purpose of executing said scheme and artifice...."

In his opening statement, the prosecutor told the jury that the government's evidence should show that Weiss and other Warner executives "schemed to defraud the company of their duty to provide honest and faithful services to the company's stockholders by creating a cash fund of approximately $170,000." The prosecutor stated that the cash fund "was created out of bribes, phony invoices, false, fraudulent and misleading documentation, and Warner checks for nine [sic] existent services." Clearly, the prosecutor's opening statement tracked almost exactly the indictment. Similarly, the evidence presented at trial showed that Weiss procured $50,000 in cash in exchange for arranging the purchase of WPT stock, and received $100,000 in cash in exchange for issuing Warner checks for non-existent services. Again, the proof at trial closely followed the terms of the indictment.

After summarizing the essential allegations of the indictment, the District Court instructed the jury, in pertinent part:

[1] The first element of [mail fraud] is the existence of a scheme to defraud or to obtain money or property by means of false or fraudulent pretenses or representations.

[2] [T]he government contends that the fraudulent scheme was the creation of the cash fund at Warner.

[3] [I]f you do find beyond a reasonable doubt that a cash fund as alleged existed at Warner, then you must go on to deliberate upon the second element of the offense of mail fraud.

[4] The second element requires that the government establish beyond a reasonable doubt that this defendant wilfully and knowingly participated in the fraudulent scheme with knowledge of its unlawful purposes and in furtherance of its unlawful objectives.

The appellant argues that the elements of the offense proved at trial had nothing to do with bribery or with conversion, or with the fraudulent concealment of cash accruing to Weiss as bribes or as converted assets, and that the cash fund theory referred to by the District Court altered an essential element of the crime. This argument has a superficial appeal because: (1) the trial judge did instruct the jury that it had to find that a cash fund existed in order to proceed to the second element of the crime; and (2) the words "cash fund" are not actually mentioned in the indictment.

The appellant's argument must fail, however, when viewed in light of the *totality* of the evidence at trial. First, the cash fund evidence presented at trial was virtually identical to the proof that was before the grand jury. Contrary to the appellant's contention, the government *never* departed from its claims in the indictment that Weiss received $70,000 in cash bribes in exchange for Warner's purchase of WPT stock and that Weiss received $100,000 in cash in exchange for the issuance of phony checks. While the use of the words "bribery" and "conversion" may not have comported with their textbook definitions, the government continued to characterize the allegedly fraudulent transactions in these terms throughout the trial. Moreover, although the face of the indictment does not refer to a cash fund, government witness Emmett testified both before the grand jury and at trial that he had "put Horowitz in touch with Solomon Weiss [because] Horowitz could be helpful with regard to the Warner *cash fund.*" (emphasis added). Finally, it is clear that the trial judge's reference to the creation of a "cash fund"

in the court's charge to the jury was nothing more than a shorthand expression for the fraudulent scheme outlined and charged in the indictment.

▇▇ Appellant also argues that a constructive amendment occurred because the "plain import" of the indictment was that Weiss personally enriched himself at the expense of the Warner shareholders. We must reject this interpretation. The language of the indictment is conspicuously silent on the ultimate destination of the fraudulently obtained funds. Nothing in the definition or the generally accepted meaning of a "bribe", commercial or otherwise, would preclude the grand jury from assuming that the monies ended up somewhere other than in Weiss's pockets.

Frankly, the cash fund evidence did not change the theoretical basis of the fraudulent scheme. Rather, as the trial court concluded, "[t]he cash fund proof offered at trial was not an alternative theory, but simply traced the proceeds of the illegal scheme." 579 F.Supp. at 1244. Finally, the cases cited by the appellant in support of his constructive amendment argument are distinguishable.

In *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), the defendant was indicted for, and convicted of, interference with interstate commerce under the Hobbs Act. The indictment identified "interstate commerce" as the importation of sand into the state for use in the construction of a steel mill. The trial judge instructed the jury, however, that it could convict the defendant for interference with the importation of sand *or* with the exportation of steel. The Supreme Court reversed the conviction, stating that "when only one particular kind of commerce is charged to have been burdened, a conviction must rest on that charge and not on

another ...." *Id.* at 218, 80 S.Ct. at 273, 4 L.Ed.2d at 257–58.[6]

Unlike *Stirone*, Weiss's conviction does not rest on an expansive reading of his indictment by the District Court. The charges in the indictment against Weiss were specific as to the dates of transactions, the amounts involved, and the identity of the participants. The government's proof covered each of the three types of fraudulent conduct that formed the basis of the overall scheme—accepting cash bribes in return for purchasing Theatre stock, issuing phony checks in exchange for cash payments, and preparing fraudulent documents to conceal the conversion of Warner checks. And, the lower court charged the jury with a succinct synopsis of the indictment. Thus, appellant's claim that *Stirone* should apply here is invalid.

▇▇ Along similar lines, this court recognizes that an amendment or variance which does not alter an essential element of the charge may still deprive the defendant of an opportunity to meet the prosecutor's case. *See Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed.2d 1314 (1935); *Lemire, supra.* As noted above, the appellant argues that he could not prepare a defense to the charges under the indictment because the government never apprised him of the "cash fund" theory prior to trial. Specifically, the appellant contends that his defenses to the charges of bribery and conversion were inapplicable to the cash fund theory.

▇▇ We reject the appellant's argument that he was prejudiced in the preparation of his trial strategy by a surprise shift in the government's theory of the case. The record proves otherwise. First, the cash fund theory was set forth in unequivocal terms at the time of the government's

---

**6.** *Cf. United States v. Miller*, 715 F.2d 1360, 1362–63 (9th Cir.1983), *modified,* 728 F.2d 1269, 1270 (9th Cir.), *cert. granted,* — U.S. —, 105 S.Ct. 78, 83 L.Ed.2d 26 (1984) (defendant indicted for violation of mail fraud statute by devising scheme to defraud insurer by knowing of and consenting to false burglary, then inflating amount of claimed loss, and jury convicted based solely on evidence of inflating claim, conviction could not be sustained); *but see United States v. Wright*, Nos. 742 F.2d 1215, 1219 (9th Cir.1984) ("An amendment is made when the court instructs the jury on a violation that is not charged in the indictment but that is consistent with the truth adduced at trial....").

opening statement, throughout the remainder of the trial, and in the jury charge conference; yet at no time did the defendant raise an objection to the evidence or to the instructions regarding this theory, nor did the defendant ever request a continuance of trial on grounds that he had not been given adequate notice of the government's case.

The government argues that Weiss waived any variance claim by failing to take exception to any evidence or instruction on the cash fund. In making this argument, the government does not contend that the alleged shift in a cash fund theory at trial constitutes a variance rather than a constructive amendment; rather, it altogether ignores the distinction. Weiss asserts that his case is the first true constructive amendment case to reach this court, and argues that reversal is required, notwithstanding the appellant's failure to raise the claim below. This circuit has been reluctant to construe an alleged "shift" in the government's theory or proof as a constructive amendment that would require reversal of a conviction "without regard to whether defendant was prejudiced by a difference between the indictment and the proof." *United States v. Heimann*, 705 F.2d 662, 665–66 (2d Cir. 1983). *See United States v. Sindona*, 636 F.2d 792 (2d Cir.1980), *cert. denied*, 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981). Rather, this circuit has treated any differences between the indictment and the proof as variances which do not require reversal absent a showing that the variance caused substantial prejudice to the defendant. *See United States v. Knuckles*, 581 F.2d 305, 312 (2d Cir.), *cert. denied*, 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978); *Sindona*, 636 F.2d at 798. While we decline to resolve the issue on the basis of waiver, the appellant's failure to object militates against any argument that he was surprised by or not prepared to defend against the cash fund theory.

■ Second, the appellant does not dispute the fact that ten months prior to trial, the government informed him that it would not claim that he had kept any of the money for his own personal use. Thus, while the government continued to refer to the cash payments Weiss received as "cash bribes," Weiss was on notice well before trial that "conventional" bribery was not part of the government's case.

Finally, the appellant implicitly argues that his defenses were appropriate against charges of bribery and of conversion but not against a charge of creating a cash fund. On appeal, Weiss contends that he established the cash fund pursuant to orders from his superiors, and that he never personally retained any of the cash. Yet Weiss never presented such claims at trial. Rather, Weiss testified in his own defense that he knew nothing either about a scheme to sell Theatre stock or about a plan to establish a cash fund at Warner, that he never received any cash payments, and that he issued Warner checks only upon the authorization of his superiors. Had the jury been persuaded by these statements, the appellant would have been acquitted under the cash fund theory; the second element of the charged offense— the knowledge of and participation in creation of the cash fund—would have been lacking.

■ The record clearly establishes that the appellant had adequate notice of the nature of the charges against him. Further, Weiss never objected to the government's theory that his knowing participation in the fraudulent creation of a cash fund constituted a mail fraud violation. His testimony disavowing any such knowledge presented the jury with a credibilty contest between the appellant and the witnesses of the government. Weiss lost. Accordingly, we hold that he had reasonable notice of the government's theory and, therefore, had and utilized the opportunity to contest on this ground and was not substantially prejudiced in his trial preparations.

In sum, we reject the appellant's argument that the government's presentation of the cash fund theory constituted a constructive amendment of the indictment.

The fraudulent scheme detailed in the indictment and proved at trial were one and the same; the term "cash fund" was merely used as a shorthand expression for the sum total of the fraudulent transactions comprising the scheme. The cash fund evidence offered at trial did not act as an alternative theory, but simply traced the proceeds of the illegal scheme. Finally, we conclude that to the extent that there was any variance between the indictment and the proof, it was not so substantial as to cause prejudice to Weiss.

## CONCLUSION

The judgment of the District Court is affirmed on all counts.

JON O. NEWMAN, Circuit Judge, dissenting in part:

Believing that an unconstitutional constructive amendment of the indictment occurred at appellant's trial, I respectfully dissent from those portions of the majority's opinion and resulting judgment that affirm the RICO and underlying mail fraud convictions. In recent years, this Court has tolerated an extraordinary expansion of mail and wire fraud statutes to permit federal prosecution for conduct that some had thought was subject only to state criminal or civil law.[1] That "inexorable expansion," *United States v. Siegel*, 717 F.2d 9, 24 (2d Cir.1983) (Winter, J., dissenting in part), has been questionable on its own terms, but whether we have rewritten the federal fraud statutes or only permitted prosecutors to apply the imprecise terms of these statutes in imaginative ways, there can be little doubt that the modern scope of federal fraud statutes now covers an extremely broad range of conduct. The current breadth of these statutes makes it especially important that in fraud prosecutions courts vigilantly enforce the Fifth Amendment requirement that a person be tried only on the charges contained in the

indictment returned by the grand jury. A criminal statute of broad scope creates some risk that conduct will be punishable even though the perpetrator may have doubted in good faith that his actions fell within the coverage of the statute. To that apparently tolerable risk is added a wholly unacceptable and unconstitutional risk when the prosecutor describes one type of actionable conduct in the indictment and then convicts the defendant for significantly different conduct. I believe that the RICO and mail fraud convictions obtained in this case are an egregious example of a constructive amendment of an indictment, in violation of the Fifth Amendment.

The core allegation of the RICO and the predicate mail fraud counts against Solomon Weiss was his participation in a scheme to defraud. The scheme charged in the indictment was a scheme to extract bribes and convert corporate checks. The scheme for which Weiss stands convicted, however, was a scheme to create a cash fund for his corporate employer. Since the alleged extraction of bribes and conversion of corporate funds were alleged to be in breach of the defendant's fiduciary duties to his corporate employer, the plain implication of the indictment is that the bribery and conversion were accomplished to the detriment of the corporation. However, creation of the cash fund, for which Weiss was convicted, was indisputably for the benefit of the corporation. The two schemes are fundamentally different in their nature and their effect. They may even be different in their criminality, since bribery and conversion of corporate funds are undoubtedly unlawful, whereas creation of a cash fund for a corporation's benefit may not be. To appreciate what happened in this case one must examine first the precise terms of the indictment and then the prosecution's case as presented to the jury.

1. *See, e.g., United States v. Siegel*, 717 F.2d 9 (2d Cir.1983); *United States v. Margiotta*, 688 F.2d 108 (2d Cir.1982), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *United States v. Newman*, 664 F.2d 12 (2d Cir.1981); *United*

States v. Bronston, 658 F.2d 920 (2d Cir.1981), *cert. denied*, 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982); *United States v. Von Barta*, 635 F.2d 999 (2d Cir.1980), *cert. denied*, 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981).

The indictment charged in Count 1 a RICO offense, 18 U.S.C. § 1962(c) (1982), accomplished through a series of mail fraud violations, 18 U.S.C. § 1341 (1982). Counts 2 through 5 alleged the mail fraud violations, consisting of the mailing of four letters in the execution of a scheme to defraud. The scheme is described in three paragraphs of Count 1, under the heading "Object of the Scheme." These paragraphs are realleged in the mail fraud counts. The first object of the scheme was that Weiss and others "did secretly and corruptly extract and accept cash bribes in return for which they caused Warner to purchase common stock in the Westchester Premier Theatre ... thereby violating their fiduciary duties to Warner and its shareholders...." Indictment, Count 1, ¶ 4. The second object was that Weiss and others "did secretly and corruptly siphon and convert approximately $221,950 in checks which belonged to Warner and its shareholders, thereby violating their fiduciary duties to Warner and its shareholders...." *Id.* ¶ 5. The third object was that "in order to siphon and to convert the checks from Warner and to conceal the fraudulent conversion of those checks," Weiss and others "did cause fraudulent documents to be prepared"; the "documents represented ... that the checks ... were being paid to third parties for services rendered to Warner" when in fact the "services were non-existent." *Id.* ¶ 6. The scheme charged in the indictment is plainly a scheme to accept bribes and to convert corporate funds, with false check entries made to conceal the conversion. A further paragraph of the indictment, headed "Methods and Means," details various check and cash transactions between Warner and Westchester Premier Theatre ("WPT") or persons associated with WPT.

The indictment makes no mention of a scheme to create a cash fund for Warner. It is not just a matter of omitting the precise words "cash fund." The indictment gives no indication whatever that Warner ever had a cash fund or that the purpose or effect of the scheme was to assemble a corporate cash fund. In fact, the detailed allegations of the "Methods and Means" paragraph plainly charge that Weiss, not Warner, ended up with the $170,000 cash obtained as a result of the scheme described in the indictment: "defendant, SOLOMON WEISS, secretly and fraudulently accepted a $50,000 cash bribe," *id.* ¶ 7(a); "defendant, SOLOMON WEISS, accepted $20,000 in cash," *id.* ¶ 7(c); "defendant, SOLOMON WEISS, ... received ... $100,000 in cash," *id.* ¶ 7(h).

At trial, the very first description of the crime that the jury heard was the following statement in the prosecutor's opening: "The government's evidence in this case will show that over a six-year period, certain high executives at Warner Communications, this nation's largest entertainment corporation, schemed to defraud the company of their duty to provide honest and faithful services to the company's stockholders *by creating a cash fund of approximately $170,000.*" (Emphasis added). The prosecutor then detailed what his evidence would be concerning what he now called "the Warner cash fund." The cash that the indictment had accused Weiss of receiving was now described as received by Weiss "on behalf of Warner."

The prosecutor's evidence detailed precisely how Weiss participated in adding cash to the Warner cash fund. His involvement began shortly after Leonard Horowitz, a stock broker interested in raising capital for WPT, approached Jay Emmett, a Warner vice-president, and offered him $50,000 in a brown paper bag as a "loan," if Emmett would buy 10,000 shares of WPT stock. Emmett declined for himself but took the proposal to Steven Ross, Warner's chairman. Ross told Emmett that Warner could not accept the loan but that Horowitz "ought to meet with Sol Weiss and maybe [h]e could be helpful in the Warner cash fund." The balance of the evidence showed just how helpful to the Warner cash fund Weiss could be.

Initially, Weiss arranged for Warner to purchase 20,000 shares of WPT stock for $150,000, and WPT kicked back $50,000 in cash to Warner and promised an additional

$50,000. When WPT defaulted on its promised kickback, Weiss secured for Warner $20,000 of the anticipated $50,000 cash by issuing $50,000 of checks for non-existent services to persons associated with WPT who returned to Warner $20,000 in cash. Subsequently Weiss arranged for Warner to buy an additional 20,000 shares of WPT stock for $100,750, and WPT promised to kick back an additional $100,000 in cash. When WPT defaulted on this second kickback obligation, Weiss secured the $100,000 in cash for Warner by issuing $171,950 of checks for non-existent services to persons associated with WPT who returned to Warner $100,000 in cash. The end result was that Warner acquired 40,000 shares of WPT stock and added $170,000 to the Warner cash fund at a total cost of $472,700.

As the case was put to the jury, the District Judge made unmistakably clear that the cash fund was the essence of the scheme to defraud. After explaining that the mail fraud offenses were offenses in their own right as well as the essential predicates of the RICO offense and that the first element of the mail fraud offenses was "the existence of a scheme to defraud," Judge Lowe said, "Now, the government contends that the fraudulent scheme was the creation of a cash fund at Warner." Then, accepting the prosecutor's shift from a bribery/conversion scheme to a cash fund scheme, the District Judge did not tell the jury that Weiss's guilt turned on whether he had extracted bribes or converted corporate funds, as the indictment alleged; instead she instructed that the jury could not convict on the RICO and mail fraud counts if "the government has not proven beyond a reasonable doubt that the cash fund alleged in the indictment existed" because "then the government will not have proven that essential element of the crime of mail fraud." Of course, the

cash fund was nowhere alleged in the indictment.

What occurred here is not simply a variance such as occurs when the evidence proves some facts materially different from those alleged in the indictment. *See United States v. Pelose*, 538 F.2d 41, 45 n. 8 (2d Cir.1976). In this case the very nature of the crime of which Weiss was convicted is significantly different from the crime charged in the indictment. That is a constructive amendment of the indictment, which violates the Fifth Amendment. *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960); *see Ex parte Bain*, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887).

A corporate official indicted for a scheme to extract bribes and convert corporate funds has a constitutional right not to be convicted unless a jury is told that he must be proven beyond a reasonable doubt to have extracted bribes or converted corporate funds. He cannot be convicted of a scheme to add to a corporate cash fund when the indictment against him contains no allegations of such conduct. The distinction between the scheme alleged in the indictment and the scheme for which the jury convicted is too fundamental to be ignored. The accusation that Weiss extracted bribes is plainly an allegation that he pocketed money as the price for being influenced in his job. Yet it is undisputed that he did no such thing. The Government's bill of particulars disclaimed "that Weiss kept for his own personal use any of the money he received from Horowitz." As the Government assures us, "At no time, did the prosecutor ever argue that Weiss personally enriched himself at Warner's expense." Brief for Appellee, 29 n. *. Rather than take a bribe to hurt his company, Weiss fulfilled the board chairman's hope that he could be "helpful" to his company by adding to its cash fund.[2] The

---

**2.** The evidence underscored just how dutiful Weiss was. Horowitz testified that he had his first dealings with Weiss at Warner's offices just moments after Emmett, as Emmett testified, had presented the first WPT proposal to Ross, who instructed Emmett to have Horowitz meet

with Weiss. According to Horowitz, Weiss counted out the $50,000 in the paper bag produced by Horowitz and then said he would be back in a few minutes. When Horowitz asked whether Weiss was going to see Ross, Weiss replied that "we don't use that name around

essence of bribery and conversion on the part of a corporate employee is acting to the detriment of a corporation. The essence of assembling a corporate cash fund, if such be unlawful, is the breach of a fiduciary's obligation to make material disclosures, an obligation that we have held violates the mail fraud statute in this context only when it is proven that the funds were used for noncorporate purposes. *United States v. Siegel, supra,* 717 F.2d at 14.

I do not doubt that some of Weiss's conduct could have been the basis of a valid mail fraud conviction. The issuance of checks falsely prepared to reflect the performance of non-existent services is a fraud on someone, ultimately the shareholders, who are deprived of an opportunity to know how corporate funds are being spent. But Weiss was not convicted of a scheme to falsify checks. The scheme, as explained to the jury by the prosecutor and the trial judge, was a scheme to assemble a corporate cash fund. The falsification of documents, which the indictment alleged was only a means for achieving the conversion objective of the scheme that was charged, cannot on appeal become the basis for affirming a conviction that was secured when the jury found the defendant guilty of a scheme to assemble a corporate cash fund.

The various arguments advanced to excuse or mitigate the fundamental switch from the crime charged to the crime proved are unavailing. Whether Weiss was sur-

prised or prejudiced, or was himself at fault for not objecting to the prosecutor's opening, the evidence, or the jury charge, is all beside the point because a constructive amendment of an indictment is the "[d]eprivation of such a basic right" that it cannot be "dismissed as harmless error." *Stirone v. United States, supra,* 361 U.S. at 217, 80 S.Ct. at 273. Weiss does not complain of overreaching argument, inadmissible evidence, or an incorrect statement of the law in the charge; his point is that the notice requirement of the Fifth Amendment has been violated. It is the totality of the trial that demonstrates the correctness of his position. Nor can I accept as justification the District Court's view that the cash fund theory "simply traced the proceeds of the illegal scheme." *United States v. Weiss,* 579 F.Supp. 1224, 1244 (S.D.N.Y.1983). At trial, as the jury charge made crystal clear, creation of the cash fund *was* the illegal scheme for which Weiss was convicted. That the fund was also the proceeds of the scheme alleged in the indictment does not permit the shift from one scheme to the other.[3] Equally unpersuasive to me is the majority's slightly different explanation that the reference to the cash fund in the jury instructions was only a "short-hand expression" for the scheme charged in the indictment. 752 F.2d at 789. Helping to raise secret cash for a corporation does not strike me as shorthand for accepting bribes.

Nor do I find the majority's invocation of prior decisions of this Court especially helpful to the effort to salvage Weiss's convic-

---

here." Weiss returned in a few minutes and increased the first transaction from a purchase of 10,000 shares and a kickback of $50,000 for the Warner cash fund to a purchase of 20,000 shares and a kickback of $100,000 for the Warner cash fund.

**3.** The issue might be somewhat closer if Weiss had not been charged with a mail fraud scheme, but instead had been charged with an offense directly based on obtaining the secret cash fund and then convicted for an offense directly based on possessing it. *Compare United States v. Gaddis,* 424 U.S. 544, 548, 96 S.Ct. 1023, 1026, 47 L.Ed.2d 222 (1976) (receipt or possession of

proceeds of bank robbery not lesser included offense within federal bank robbery provisions), *with Dove v. Peyton,* 343 F.2d 210, 213 (4th Cir.1965) (receiving stolen property is lesser included offense within offense of larceny under explicit Virginia statutory provision, Code of Virginia § 18.1–107 (1950)). But even if lesser included offense concepts could be enlisted in such a situation, they provide no basis for upholding what occurred here, where a conviction that can be viewed at best as based on a scheme to funnel proceeds from wrongdoing into a cash fund was obtained under an indictment alleging a scheme to commit the wrongdoing.

tion. The majority cites *United States v. Heimann*, 705 F.2d 662, 665–66 (2d Cir. 1983), to show that we have been reluctant to regard an alleged shift in the Government's theory or proof as a constructive amendment of an indictment. Yet *Heimann* involved no shift at all in the theory of the crime alleged and only the most inconsequential shift in the proof. The only shift this Court detected was a slight variation between the indictment and the proof with respect to the time when the defendant's dealings with the victims first became fraudulent. *Id.* at 666–68. In *United States v. Sindona*, 636 F.2d 792, 797–99 (2d Cir.1980), *cert. denied*, 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981), we concluded that no prejudicial variance occurred when the core allegation of the indictment was concealment of the fact that the funds in question did not belong to the defendant and the proof showed that the concealment occurred because the funds were obtained by means of a fiduciary contract, rather than by means of embezzlement, as language of the indictment had alleged. In *United States v. Knuckles*, 581 F.2d 305, 308–12 (2d Cir.), *cert. denied*, 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978), a conviction for distribution of a controlled substance was upheld though the indictment alleged heroin and the proof showed cocaine. These cases, involving slight variances as to details, provide no support for the total shift that occurred in this case between the crime for which Weiss was indicted and the crime for which he was convicted.

I agree that Weiss's conviction on three counts of perjury should be affirmed and therefore dissent only as to the RICO and mail fraud convictions. Though this dissent is of no help to Weiss, it may enforce some protection for others if it prompts the Government in future fraud cases to think through the nature of the crime it wishes to allege and then spell out the offense in a carefully drafted indictment, instead of confronting the defendant with its theory of criminality for the first time at trial.