UNITED STATES of America, Appellee,

v.

Joseph ZINGARO, Appellant.

No. 602, Docket 87–1406.

United States Court of Appeals,
Second Circuit.

Argued Jan. 29, 1988.

Decided Sept. 21, 1988.

MAHONEY, Circuit Judge:

Joseph Zingaro appeals from a judgment of the United States District Court for the Eastern District of New York, Jack B. Weinstein, (then) *Chief Judge,* convicting him after a jury trial of one count of RICO conspiracy in violation of 18 U.S.C. § 1962(d) (1982). On appeal, Zingaro contends that the trial court's admission of evidence concerning a loan not specified in the indictment allowed the jury to find predicate acts of loansharking and unlawful debt collection that were not embraced by the specific charges of the indictment, thus constituting a constructive amendment of the indictment in violation of the grand jury clause of the fifth amendment. Agreeing, we reverse and remand.

### Background

Zingaro was charged in a superseding indictment with one count of RICO conspiracy, 18 U.S.C. § 1962(d) (1982), and two substantive counts of conducting an illegal gambling business, 18 U.S.C. § 1955 (1982). The RICO enterprise was alleged to be the "Gambino Crime Family ...[,] a secret criminal organization which operated within the Eastern District of New York and elsewhere." The RICO conspiracy count generally charged Zingaro with conspiring to conduct the affairs of the Gambino family by agreeing "to the commission of multiple acts of extortionate extension and collection of credit and the operation of illegal gambling businesses."

The part of the massive indictment[1] that alleged Zingaro's particular violations specified four categories of predicate racketeering acts: (1) extortionate extension of credit, 18 U.S.C. § 892 (1982); (2) extortionate collection of credit, 18 U.S.C. § 894 (1982); (3) operation of a sports betting business illegal under New York law, 18 U.S.C. § 1955 (1982); and (4) operation of a card game and "Zigonett" game business illegal

Judd Burstein, New York City (Jay Goldberg, New York City, of counsel), for appellant.

Douglas E. Grover, Organized Crime Strike Force, Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty. for E.D.N.Y., Brooklyn, N.Y., John F. DePue, Atty. Dept. of Justice, Washington, D.C., Laura A. Ward, Sp. Atty., Organized Crime Strike Force, Brooklyn, N.Y., of counsel), for appellee.

Before VAN GRAAFEILAND, MESKILL and MAHONEY, Circuit Judges.

---

1. The sixty-six page superseding indictment charged sixteen defendants with numerous offenses, including RICO, extortion, labor racketeering, loansharking, conduct of illegal gambling businesses, obstruction of justice, bribery and interstate travel violations. Chief Judge Weinstein severed the case into seven "separate trial segments," *United States v. Gallo,* 668 F.Supp. 736, 758 (E.D.N.Y.1987), and Zingaro was tried alone, *id.* at 760.

under New York law, 18 U.S.C. § 1955. The RICO conspiracy count also charged Zingaro with conspiring, in violation of 18 U.S.C. § 1962(d) (1982), to conduct Gambino family affairs by the collection of unlawful debt. *See* 18 U.S.C. §§ 1961(6) (1982) (defining "unlawful debt") and 1962(c) (1982) (providing as alternative bases of criminal liability the conduct of the affairs of a RICO enterprise *either* "through a pattern of racketeering activity," *i.e.*, two or more acts of racketeering activity, *or* through "collection of unlawful debt"). The indictment detailed Zingaro's alleged involvement in Yonkers "social clubs," which offered card games and a "Zigonett" game to players, as well as extortionate loans to cover the players' gambling losses, as the basis both for the predicate racketeering acts and the collection of unlawful debt.

At trial, the government introduced evidence, primarily through the testimony of a cooperating coconspirator, Basil Cannata, that Zingaro was the "skipper" of a loansharking-gambling operation conducted in two clubs in Yonkers, the "Feathers" and "Maple Hill" social clubs. Cannata testified that he ran these operations, but that Zingaro and another coconspirator, Frank Mastricova, received a portion of the profits and provided loan money.

The government also elicited testimony from Cannata concerning a $50,000 loan made by Zingaro, Mastricova and Cannata to someone identified as "George the Greek." There was no evidence that this loan was in any way connected to the Yonkers social clubs and gambling operations. Rather, the loan was sought solely for the purpose of renovating George the Greek's diner in the Bronx. The government corroborated Cannata's testimony that the funds for the loan came from Zingaro and one "Rogie" by introducing Mastricova's address book, which included the notations "Rogie 16000" and "Joe Z. 20000." An F.B.I. expert witness testified that these notations were accounts of extortionate credit transactions.

Defense counsel conceded that the evidence concerning the loan to George the Greek was admissible for the limited purpose of establishing the existence of the enterprise and demonstrating Zingaro's role in it. Defense counsel contended, however, that the evidence was not admissible as an independent basis for the jury to find loansharking or the collection of unlawful debt. Arguing that the indictment was narrowly drawn to charge only loansharking and unlawful debt collection related to the business of the Yonkers gambling clubs, counsel timely requested a limiting instruction.[2] The district court denied this request on the ground that the indictment was not so narrowly drawn.

In summation, the government recounted in detail the circumstances of the "George the Greek" loan, and emphasized that Zingaro was "the source," "the director of the operation," and "got a piece of the action" with respect to that loan.[3] Defense coun-

---

**2.** The proposed instruction read as follows:

You have heard evidence about loans, allegedly made to individuals such as "George the Greek" and "Foxie", which did not arise out [sic] the alleged card games at the Feathers and Maple Hill social clubs. This evidence is relevant on the issues of the existence of the racketeering enterprise and the defendant's alleged membership in it. However, even a finding that such loans were made, and that defendant provided some or all of the money for them, cannot justify a guilty verdict on the loansharking and unlawful debt collection charges in the indictment. Each of those charges alleges that loans were made to card players at the social clubs so that they could pay their gambling debts. Hence, in addition to all the other elements that you must find as to these charges, you also must find beyond a reasonable doubt that there were loans made to social club card players so that they could meet their gambling debts. Moreover, with respect to the unlawful debt collection charge, you must also find that there was an ongoing business of lending money to the players.

**3.** The government argued:

Finally, on one occasion we have Frank Mastricova couldn't handle a fifty thousand dollars [sic] loan. This was a loan to George the Greek. A fellow we only know by that name, a fellow who apparently owned a diner in Riverdale.

And Basil Cannata tells us that his brother-in-law, Frank Mastricova, had to go to two people, Joe Zingaro and another fellow named Roggie [sic]. As a result he drove them around to Zingaro. Zingaro had an office or

sel thereafter renewed the request for a limiting instruction concerning the "George the Greek" evidence. The request was again denied, and the case was submitted to the jury. During its deliberations, the jury requested a transcript of the F.B.I. agent's testimony concerning the notations in Mastricova's address book.

When the jury returned its verdict, they found Zingaro not guilty on the two substantive gambling business counts, which corresponded to the two gambling business predicate acts of the RICO conspiracy count. The jury found Zingaro guilty, however, on the RICO conspiracy count, which required a finding that Zingaro agreed *either* to commit at least two predicate acts of racketeering (*i.e.*, a pattern of racketeering activity), *or* to engage in the collection of unlawful debt. · *See* 18 U.S.C. § 1962(d) and (c) (1982). Their verdict indicated the following: predicate act number one (extortionate extensions of credit)—proven; predicate act number two (extortionate collections of credit)—deadlocked; predicate act number three (sports betting business)—not proven; predicate act number four (social club gambling business)—deadlocked; collection of unlawful debt proven.

The district court then instructed the jury to resume deliberations concerning the predicate acts (two and four) as to which it was deadlocked. The court also instructed the jury that it should specify whether it had found only one unlawful debt collection or more than one.[4] The government suc-

cessfully opposed defense counsel's request that the jury be instructed to specify further which debt it had found, *i.e.*, whether it was the "George the Greek" debt.

The jury returned again with a supplemental verdict finding predicate act number two (extortionate collections of credit) proven, but predicate act number four (social club gambling business) not proven. Having found both the extortionate extension of credit and the extortionate collection of credit predicates to have been proven, the jury also indicated that the government had proven collection of only one unlawful debt. After polling the jury, the district court accepted its verdict and discharged the jury.

Zingaro was sentenced to five years in prison, a $250,000 fine and a $50 special assessment. Immediately after announcing the sentence, however, the district court granted Zingaro bail pending appeal, "[i]n view of the fact that there are very serious problems here with respect to the validity of the conviction." This appeal followed.

## Discussion

The issue on appeal is the effect of the admission of the "George the Greek" loan evidence, without any limiting instruction, despite the fact that the indictment nowhere mentions this loan or specifies (as to Zingaro) any loans made to victims not associated with the Yonkers social clubs.

---

some place or some premises. It wasn't important to Cannata at the time as it wouldn't be to you if you were in the same circumstances.

\*   \*   \*   \*   \*   \*

Basil Cannata told us that Frank Rummy Mastricova got an envelope from Mr. Zingaro. And then they took a drive over to a place called Gun Hill Lumber and he met an individual. That is, Frank Mastricova met an individual named Roggie [sic]. And at that point Mastricova and Cannata came home. And when they got home low [sic] and behold they were short of the money. Four thousand dollars short. And Mastricova was steaming. Steaming because he had to pay that four thousand dollars. Steaming because it was cutting into his earnings. Steaming because he was responsible for it.

That money, as we heard it, ended up being forty two thousand five hundred dollars was brought over to George the Greek.
Why? Because he already owed seventy-five hundred. That money was brought over to George the Greek with an obligation to pay a high rate of interest. I believe it was five points. And you can check the record on that.
But what was Joseph Zingaro's role in that? He was the source. He was the director of the operation. He had knowledge of what was going on. And he got a piece of the action.

4. Zingaro contended below that the unlawful debt collection provision of 18 U.S.C. § 1962(c) requires a finding of at least two debt collections, but this issue was not pursued on appeal and we do not address it.

More specifically, the issue is whether submission of the "George the Greek" loan to the jury as a basis upon which Zingaro could be convicted for RICO conspiracy constituted a constructive amendment of the indictment or merely a variance in proof at trial. *See generally United States v. Weiss*, 752 F.2d 777, 786–91 (2d Cir.), *cert. denied*, 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985).

■ The distinction between an amendment and a variance is determinative in this case, because Zingaro frankly concedes that he was not prejudiced by any lack of notice that the government intended to use evidence of the "George the Greek" loan at trial. It is well settled that the constructive amendment of an indictment is *per se* violative of the grand jury clause of the fifth amendment;[5] on the other hand, to prevail on a variance of proof claim, a defendant must demonstrate prejudice. *Weiss*, 752 F.2d at 787. As the Supreme Court has stated, the "very purpose of the requirement that a man be indicted by grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge." *Stirone v. United States*, 361 U.S. 212, 218, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960). Where an essential element of the charges has been altered without resubmission to the grand jury, "[d]eprivation of such a basic right is far too serious to be treated as nothing more than a variance and then dismissed as harmless error." *Id.* at 217, 80 S.Ct. at 273.

One characterization of the distinction between an amendment and a variance has been repeated frequently:

An *amendment* of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecutor or court after the grand jury has last passed upon them. A *variance* occurs when the charging terms of the indictment are left unal-

tered, but the evidence offered at trial proves facts materially different from those alleged in the indictment.

*Gaither v. United States*, 413 F.2d 1061, 1071 (D.C.Cir.1969) (footnotes omitted). Unfortunately, this general characterization did not dispel the "considerable confusion as to what constitutes a constructive amendment of an indictment as opposed to a variance...." *Weiss*, 752 F.2d at 787. The matter was considerably clarified, however, in *United States v. Miller*, 471 U.S. 130, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985).

In *Miller*, the defendant was charged with violating the federal mail fraud statute, 18 U.S.C. § 1341 (1982), by defrauding an insurer. The scheme to defraud, as alleged in the indictment, included *both* fraudulently consenting to a burglary of the defendant's business *and* fraudulently misrepresenting the amount of the burglary loss to the insurer. At trial, the government introduced evidence clearly sufficient to prove all the requisite elements of mail fraud, but only in connection with Miller's fraudulent overstatement of the actual burglary loss. There was no proof that Miller gave his prior consent to the burglary.

The Supreme Court held that the variance between the scheme alleged in the indictment and the scheme proved at trial did not constitute an unconstitutional amendment of the indictment, because the proof at trial did not *broaden* the possible basis for conviction beyond what was contained in the indictment. *Miller*, 471 U.S. at 145, 105 S.Ct. at 1819. The court explicitly repudiated the ruling in a prior case, *Ex Parte Bain*, 121 U.S. 1, 75 S.Ct. 781, 30 L.Ed. 849 (1887), that "it constitutes an unconstitutional amendment to drop from an indictment those allegations that are unnecessary to an offense that is clearly contained within it." *Miller*, 471 U.S. at 144, 105 S.Ct. at 1819.

The court in *Miller* distinguished *Stirone v. United States*, 361 U.S. 212, 80 S.Ct.

5. The grand jury clause of the fifth amendment provides:

No person shall be held to answer for a capital, or otherwise infamous crime, unless

on a presentment or indictment of a Grand Jury....

270, 4 L.Ed.2d 252 (1960), in which a conviction was reversed precisely because the proof at trial established a basis for conviction that was broader than the basis stated in the indictment. *Miller*, 471 U.S. at 138–40, 105 S.Ct. at 1816–17. In *Stirone*, an indictment for violation of the Hobbs Act alleged that the defendant unlawfully interfered with interstate commerce by obstructing the importation of sand into Pennsylvania by the owner of a plant in that state which used the sand in the manufacture of concrete. The evidence at trial, however, established as an alternative basis for conviction that the concrete was used to construct a steel mill from which manufactured articles were shipped into interstate commerce. *Stirone*, 361 U.S. at 214, 80 S.Ct. at 271. In reversing Stirone's conviction, the Supreme Court concluded that he might have been "convicted on a charge the grand jury never made against him." *Id.* at 219, 80 S.Ct. at 274.

The distinction between *Stirone* and *Miller* is that:

> In contrast to Stirone, Miller was tried on an indictment that clearly set out the offense for which he was ultimately convicted. His [Miller's] complaint is not that the indictment failed to charge the offense for which he was convicted, but that the indictment charged more than was necessary.

*Miller*, 471 U.S. at 140, 105 S.Ct. at 1817. In other words, the charges against Stirone were constructively broadened, whereas the charges against Miller were constructively narrowed. *See United States v. Castro*, 776 F.2d 1118, 1123 (3d Cir.1985) (no constructive amendment where "variation did not broaden the bases for conviction, but instead narrowed the scope of the evidence to prove an offense included in the indictment"), *cert. denied*, 475 U.S. 1029, 106 S.Ct. 1233, 89 L.Ed.2d 342 (1986); *United States v. Kuna*, 760 F.2d 813, 817–18 (7th Cir.1985) (describing *Miller* as distinguishing constructive amendments that broaden possible bases for conviction from variations that narrow indictment's charges without adding any new offenses).

Applying the principles of *Miller* and *Stirone*, we would have no hesitation in reversing Zingaro's conviction if, as he argues, the indictment alleges only loan-sharking predicate acts and collection of unlawful debt specifically arising out of Zingaro's involvement in Yonkers social clubs. The "George the Greek" loan did not arise out of the gambling activities allegedly conducted at the Yonkers social clubs, and indeed there is no suggestion that George the Greek ever incurred gambling debts for which he needed Zingaro's loans or that he ever even entered one of the Yonkers clubs. *Cf. United States v. Yeo*, 739 F.2d 385, 387 (8th Cir.1984) (constructive amendment where indictment referred to extortion from a specific individual but government was allowed to introduce evidence of extortions from others as alternative basis for conviction); *United States v. Cusmano*, 659 F.2d 714, 719 (6th Cir.1981) (constructive amendment where indictment charged extortion by means of threatened economic loss but government was allowed to introduce evidence of threatened physical violence as alternative means of extortion). The introduction of the diner loan evidence, without the suggested limiting instruction, clearly provided a broader basis for conviction than the social club gambling loans charged in the indictment.

The Supreme Court has made it clear, however, that an indictment drawn in more general terms may support a conviction on alternative bases, even though an indictment with specific charging terms will not:

> It follows that when only one particular kind of commerce is charged to have been burdened a conviction must rest on that charge and not another, even though it be assumed that under an indictment drawn in general terms a conviction might rest upon a showing that commerce of one kind or another had been burdened.

*Stirone*, 361 U.S. at 218, 80 S.Ct. at 274; *see also United States v. Cusmano*, 659 F.2d 714, 719 (6th Cir.1981); *United States v. Haldeman*, 559 F.2d 31, 128 (D.C.Cir. 1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). So here,

the government contends that the indictment in this case was drawn in terms general enough to support convictions under 18 U.S.C. § 1962(d) and (c) (1982) for a pattern of racketeering activity (*i.e.,* loansharking predicate acts) or collection of unlawful debt based upon the loan to George the Greek.

In this connection, the government points to an introductory allegation that Zingaro "agreed to the commission of multiple acts of extortionate extension and collection of credit and the operation of illegal gambling businesses" (indictment ¶ 14(f)), as well as to the more specific allegations relating to predicate racketeering acts (*id.* ¶ 31) and unlawful debt collection (*id.* ¶ 40(i)) asserted against Zingaro. We do not find the introductory allegation in paragraph 14(f) particularly helpful, since (1) it obviously anticipated detailed particularization later in the indictment, and (2) says nothing one way or the other as to the relationship, or lack thereof, between the loansharking and illegal gambling activities charged against Zingaro. We therefore turn to the more specific allegations of the indictment.

With regard first to the two predicate acts of loansharking found by the jury— *i.e.,* extortionate extensions of credit and extortionate collections of credit—the indictment is drawn very specifically to cover only loans made in connection with the Yonkers social club gambling activities. Paragraph 31 of the indictment, which sets out the predicate acts of loansharking upon which Zingaro was convicted, bears the heading "Yonkers Social Club Loansharking." [6] The six subparagraphs (a-f) that spell out the loansharking charges allege specifically: Zingaro's ownership and management of the gambling business; that players needed loans to cover losses; that Zingaro extended usurious loans to players through his operative, Basil Cannata; that players knew that harm would result to them if they failed to repay these loans, and they accordingly repaid them; and that Zingaro shared in the proceeds from repayment of these loans. There is no room in these highly specific allegations

---

**6.** The full text of this portion of the indictment reads:

#### Yonkers Social Club Loansharking

31. It was a part of the pattern of racketeering activity that in or about and between 1980 and 1984, both dates being approximate and inclusive, within the Southern District of New York and elsewhere, the defendant, JOSEPH ZINGARO, together with Paul Castellano, Frank Mastricova, and others known and unknown to the Grand Jury, would and did knowingly, willfully, and unlawfully make and collect extortionate extensions of credit, as that term is defined in Title 18, United States Code, Section 891(6), in violation of Title 18, United States Code, Sections 892, 894, and 2.

a. It was a part of the pattern of racketeering activity that the defendant, JOSEPH ZINGARO, together with Paul Castellano, Aniello Dellacroce, Frank Mastricova, and others known and unknown to the Grand Jury, would and did conduct, manage, supervise, direct, and own all or part of an illegal gambling business, to wit: social clubs offering card games and a "Zigonett" game, in violation of Section 225.10 of the Penal Law of the State of New York.

b. It was a further part of the pattern of racketeering activity that "players," as that term is defined in Section 225.00 of the Penal Law of the State of New York, who would engage in gambling activity at the social clubs heretofore described, would and did require loans of money to cover gambling losses and make additional wagers.

c. It was a further part of the pattern of this illegal racketeering that Basil Cannata, as an operator of this illegal gambling business, on behalf of Frank Mastricova and the defendant, JOSEPH ZINGARO, would and did loan money to players at usurious rates of interest in excess of fifty percent per annum.

d. It was a further part of the pattern of racketeering activity that players who would borrow this money understood that any delay in making repayment, or failure to make repayment, could result in the use of violence and other criminal means to cause harm to the players, their reputation, and property.

e. It was a further part of the pattern of racketeering activity that as a result of express and implicit threats of use of violence or other criminal means to cause harm to the players, their reputation, and property, the players would and did repay both principal and interest of the loans heretofore described.

f. It was a further part of the pattern of racketeering activity that the defendant, JOSEPH ZINGARO, together with Paul Castellano, Frank Mastricova, and others known and unknown to the Grand Jury, would and did receive a portion of the proceeds of the repayment of loans and interest heretofore described.

for an alternative charge unrelated to the Yonkers gambling business.

The government stresses, however, the fact that paragraph 31 of the indictment, as well as each ensuing subparagraph, begins with the words "[i]t was a *part* [or a "*further part*"] of the pattern of racketeering activity" (emphasis added). We do not regard the use of this language as altering the outcome. In the context of a RICO conspiracy, a pattern of racketeering activity requires a finding that the defendant conspired to commit at least two predicate acts. *See* 18 U.S.C. §§ 1962(d) and (c) (1982), and 1961(5) (1982). The natural meaning of the introductory language is accordingly that each new allegation is part of that pattern, rather than, as the government would have us imply, that the specified social club loansharking is only a portion of a broader array of loansharking activities in which Zingaro conspired to participate.

We therefore turn to the alternative basis for imposing liability under 18 U.S.C. § 1962(d) and (c) (1982), "collection of unlawful debt." The pertinent provision of the RICO conspiracy count of the indictment is paragraph 40(i).[7] The heading of this subparagraph is "Unlawful Debt Collection in Yonkers Social Clubs." The charging language of the subparagraph refers, however, to the collection *both* of debts:

which would be and were incurred in connection with the business of lending money at a rate usurious under the law of the State of New York, where the usurious rate was at least twice the enforceable rate; *and* debts which were incurred and contracted in gambling activity, to wit: card games and a 'Zigonnet' game, and which would be and were incurred in connection with the business of gambling in violation of Section 225.10 of the Penal Law of the State of New York.

Indictment paragraph 40(i) (emphasis added). *See* 18 U.S.C. § 1961(6) (1982) (defining RICO "unlawful debt"). Furthermore, the numbered subparagraphs detailing the Yonkers social club debt collections which are specified under this subparagraph, in accordance with its heading, are introduced by this language (in subparagraph (1)): "*Among the means* by which . . . ZINGARO . . . would and did participate in the collection of unlawful debts were the following

---

7. The full text of this portion of the indictment reads:

*Unlawful Debt Collection in Yonkers Social Clubs*

i. In or about and between 1980 and 1984, both dates being approximate and inclusive, within the Southern District of New York, State of New York, and elsewhere, the defendant, JOSEPH ZINGARO, together with Frank Mastricova and others known and unknown to the Grand Jury, would and did engage in the collection of unlawful debts, that is, the collection of debts which would be and were unenforceable under laws of the State of New York in whole or in part as to principal and interest because of the laws relating to usury, and which would be and were incurred in connection with the business of lending money at a rate usurious under the law of the State of New York, where the usurious rate was at least twice the enforceable rate; and debts which were incurred and contracted in gambling activity, to wit: card games and a "Zigonnet" game, and which would be and were incurred in connection with the business of gambling in violation of Section 225.10 of the Penal Law of the State of New York.

(1) Among the means by which the defendant, JOSEPH ZINGARO, together with Frank Mastricova, and others known and unknown to the Grand Jury, would and did participate in the collection of unlawful debts were the following:

(2) The defendant, JOSEPH ZINGARO, together with Frank Mastricova and others known and unknown to the Grand Jury, would and did conduct, manage, supervise, direct, and own all or part of an illegal gambling business, to wit: social clubs offering card games and a "Zigonnet" game, in violation of Section 225.-10 of the Penal Law of the State of New York.

(3) "Players," as that term is defined in Section 225.00 of the Penal Law of the State of New York, who would and did engage in gambling activity at the social clubs heretofore described, would and did require loans of money to cover gambling losses and facilitate additional wagers.

(4) Basil Cannata, as an operator of the illegal gambling business heretofore described, on behalf of Frank Mastricova and the defendant, JOSEPH ZINGARO, would and did lend money to players at usurious rates of interest in excess of fifty percent.

(5) The defendant, JOSEPH ZINGARO, together with Frank Mastricova and others known and unknown to the Grand Jury, would and did receive a portion of the proceeds of the repayment of loans and interest heretofore described.

[followed by descriptions of collections from "players" at the Yonkers social clubs]" (emphasis added).

The government points to these latter features of paragraph 40(i) of the indictment as providing a proper basis for convicting Zingaro for an unlawful collection of the "George the Greek" debt, thereby preserving Zingaro's conviction from reversal on the grounds of a constructive amendment of the indictment. Although the government's argument on this aspect of the indictment is somewhat more persuasive than its alternative contention based upon the "pattern of racketeering activity" language of section 1962(c), we find it ultimately unavailing.

Paragraph 40 of the indictment, which is headed "Collection Of Unlawful Debts," includes subparagraphs (a) to (i) dealing with various unlawful debt collections. These subparagraphs are preceded by the following headings:

a. Unlawful debt collection [by defendant Joseph Corrao] from Henry Riverola;

b. Unlawful debt collection [by defendant Joseph Corrao] from Frank Ancona;

c. Unlawful debt collection by JOSEPH CORRAO from other individuals;

d. Unlawful debt collection [by defendants Joseph N. Gallo and Thomas Agro] from Donald Brown;

e. Unlawful debt collection by JOSEPH N. GALLO and THOMAS AGRO from other individuals;

f. Unlawful debt collection [by defendant Anthony Vitta] from Richard Sanchez;

g. Unlawful debt collection by JOSEPH ARMONE and ANTHONY VITTA from other individuals;

h. Unlawful debt collection by ANGELO RUGGIERO from other individuals; and

i. Unlawful debt collection [by defendant Joseph Zingaro] in Yonkers social clubs.

These headings fairly describe the text of the subparagraphs of paragraph 40 of the indictment. Obviously, the practice followed in that indictment was to make specific reference to debt collections from individuals whose identity was known to the grand jury and the government at the time the indictment was drafted, and to refer to "other individuals unknown to the Grand Jury" where there was a basis for charging one or more defendants with illegal debt collections from unknown individuals. This pattern quite thoroughly undercuts the government's contention that the oblique references which we have described should be read as including an illegal debt collection by Zingaro from George the Greek.

We now consider those references. Very little weight can be given, in our view, to the fact that subparagraph (i) of paragraph 40 refers to the collection of debts illegal under New York law both because (a) usurious and (b) incurred in connection with the business of gambling. This language essentially tracks the provisions of 18 U.S. C. § 1961(6) (1982). Furthermore, the loans to "players" at the Yonkers social clubs described in the indictment would be illegal under both of these aspects of New York law. Paragraph 31 of the indictment explicitly states that the loans in question were both usurious (subparagraph (c)) and incurred in connection with an illegal gambling business violative of New York law (subparagraph (a)). We accordingly conclude that the reference in subparagraph (i) to both aspects of illegality carries no necessary or even likely implication that illegal debt collections by Zingaro other than from "players" at the Yonkers social clubs were comprehended by the indictment.

Alternatively, the government points to the introduction of the numbered subparagraphs of paragraph 40(i) of the indictment, which detail Zingaro's unlawful debt collections in Yonkers social clubs, with the statement that these collections were "among the means" by which Zingaro violated 18 U.S.C. § 1962(d) (1982). The argument is that the other means, including the unmentioned loan to George the Greek, were implicitly included in the indictment as a result of this open-ended introductory language.

We disagree. The headings and the particulars of the pertinent provisions of the

indictment (including those relating to predicate acts and separate counts of illegal gambling of which Zingaro was acquitted) give no inkling that he was charged with extortions unrelated to the activities of the Yonkers social clubs. The cases where saving language of this nature has been given effect typically involved additional activities of the same character as those specifically charged in the indictment.

In *United States v. Caine*, 441 F.2d 454 (2d Cir.), *cert. denied*, 404 U.S. 827, 92 S.Ct. 59, 30 L.Ed.2d 55 (1971), for example, an indictment charged that advertising promulgated by the defendants contained false statements, "including among others" certain specified statements. Evidence was allowed as to false statements concerning refunds, although these were not among the falsehoods specified in the indictment. The court concluded: "The grand jury's failure specifically to mention fraud with respect to refunds was most likely due to the belief that further spelling out of defendants' fraudulent scheme was redundant." *Id.* at 457. Here, on the contrary, the omitted loan to George the Greek fell entirely outside the criminal "scheme" alleged against Zingaro. *Cf. United States v. Dunn*, 758 F.2d 30, 37 (1st Cir.1985) (conspiracy charge deemed to extend to collaboration with unnamed conspirator involving "the same bus company, the same contract, and very similar monetary arrangements").

Accordingly, as in *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed. 2d 252 (1960):

> [B]ecause of the court's admission of evidence [relating to the loan to George the Greek] and under its charge this might have been the basis upon which the trial jury convicted [Zingaro]. If so, he was convicted on a charge the grand jury never made against him. This was fatal error.

*Id.* at 219, 80 S.Ct. at 274.

## Conclusion

The provisions of the indictment to which the government points do not fairly comprehend the loan to George the Greek. The introduction of evidence concerning that loan impermissibly broadened the charges against Zingaro, resulting in a constructive amendment of the indictment requiring reversal.

REVERSED AND REMANDED.