**UNITED STATES of America,
Appellee–Cross Appellant,**

v.

**Michael J. LOHAN, also known as
Michael Desiderio, Defendant–
Appellant–Cross Appellee.**

Nos. 1447, 1448, Dockets
90–1637, 90–1660.

United States Court of Appeals,
Second Circuit.

Argued May 15, 1991.

Decided Sept. 23, 1991.

Charles S. Kleinberg, Asst. U.S. Atty., E.D.N.Y., Brooklyn, N.Y., (Andrew J. Maloney, U.S. Atty., and Robert L. Begleiter, Asst. U.S. Atty., of counsel), for appellee-cross appellant U.S.

Salvatore S. Russo, Brooklyn, N.Y., for defendant-appellant-cross appellee Michael J. Lohan.

Before CARDAMONE, PIERCE and FRIEDMAN,* Circuit Judges.

FRIEDMAN, Circuit Judge:

This appeal and cross-appeal challenge on various grounds only the sentence imposed upon the appellant Lohan following his guilty plea to criminal contempt, 18 U.S.C. § 401(3) (1988). We affirm-in-part, vacate-in-part, and remand.

I

In 1987, Lohan was president of his firm, New York Futures Traders, Inc. (Traders), a commodities futures broker. In that year, Lohan and Traders settled a civil action in the United States District Court for the Eastern District of New York, brought against them by the Commodities Futures Trading Commission (Commission), which alleged that Lohan and Traders had defrauded their customers of approximately $130,000 and had solicited investments in commodities futures without being registered with the Commission.

Upon the consent of the parties, the district court entered a broad and detailed injunction against Lohan and Traders. *Commodities Futures Trading Commission v. New York Futures Traders Inc.,* No. CV–86–0770 (E.D.N.Y. Apr. 1, 1987) (the April 1987 injunction). In addition to barring Lohan and Traders from violating various provisions of the Commodities Exchange Act, the April 1987 injunction enjoined them from "[c]heating or defrauding, or attempting to cheat or defraud, any person" in connection with any commodi-

ties futures transaction, and specified particular fraudulent practices that the provisions covered, such as "[c]onverting customer funds to their own use" and making "false, deceptive and misleading" oral statements to customers.

At about the same time, the State of New York instituted a criminal prosecution of Lohan for grand larceny and securities fraud, based on the same facts that gave rise to the federal injunction suit. In April 1987, Lohan pleaded guilty to a misdemeanor securities fraud charge and was sentenced to 90 days imprisonment.

Shortly after his release from custody on the New York conviction, Lohan changed his name to "Michael Desiderio" and incorporated a new firm, Donateco, Inc. (Donateco), of which he was the chief executive officer. In the Fall of 1988, the Commission, based upon information received from a Donateco customer, opened a new investigation into Lohan's activities, and instituted a new civil action against Lohan and Donateco. The Commission's investigation revealed that Lohan had operated Donateco as a commodities broker in Florida and had engaged in other activities prohibited by the April 1987 injunction.

On November 8, 1989, at the government's request, the district court issued an order to Lohan to show cause at a hearing on January 4, 1990, "why he should not be found to be in violation of 18 U.S.C. § 401(3) for criminal contempt ..." (the November 1989 order). That order specified the contemptuous acts Lohan allegedly had committed, and contained three paragraphs making specific accusations that he had "cheated or defrauded customers" and others. The order provided that if Lohan were found guilty of criminal contempt of the April 1, 1987 injunction, he would be "subject to an appropriate fine and a term of imprisonment not to exceed six months." The order also directed Lohan's arrest.

From late October, 1989 to February 14, 1990, however, Lohan was a fugitive from justice on unrelated New York State criminal charges, and was never served with the

---

* Daniel M. Friedman, of the Court of Appeals for the Federal Circuit, sitting by designation.

November 1989 order or arrested thereunder. After New York State authorities located and arrested Lohan, the district court (a different judge presiding) on March 1, 1990 issued a new order to show cause (the March 1990 order). The March 1990 order was substantially the same as the November 1989 order, except that it did not limit Lohan's imprisonment upon conviction to six months, but instead referred to "an appropriate term of imprisonment." Lohan was taken into federal custody pursuant to the March 1990 order and appeared at a bail hearing on March 5, 1990.

In June 1990, Lohan agreed to plead guilty to criminal contempt of the April 1987 injunction without any specification of the contemptuous acts he committed. The court then issued a new order to show cause (the June 1990 order) which only charged, without specification, that Lohan had violated the April 1987 injunction. The June 1990 order also provided that,

> in the event defendant is found guilty of criminal contempt of the April 1, 1987 Final Judgment and Order of Injunction, he shall be subject to an appropriate fine and an appropriate term of imprisonment, and since defendant may be sentenced to a term of imprisonment exceeding 6 months, he is entitled to a jury trial.

At the plea hearing on June 13, 1990, the court informed Lohan of his constitutional rights, including the fact that he was "facing—not necessarily going to get, but facing a term of imprisonment in excess of six months." Lohan pleaded guilty to the willful violation of the court's April 1987 injunction. The government stated that, for sentencing purposes, it intended to prove at a subsequent *"Fatico"* hearing the facts constituting contempt, including any fraud. A *"Fatico"* hearing is a sentencing hearing at which the prosecution and the defense may introduce evidence relating to the appropriate sentence. *See United States v. Fatico,* 603 F.2d 1053 (2d Cir. 1979), *cert. denied,* 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980).

At the sentencing hearing, the district court ruled that the government had presented "clear and convincing evidence" at the *Fatico* hearing that "various individuals were defrauded of their funds" and that Lohan, as specified in the presentence report, "willfully violated the Court's order by fraud and deceit and admitted the same. . . ." The presentence report described extensive violations of the April 1987 injunction.

Noting that there was no sentencing guideline directly applicable to criminal contempt, the court sentenced Lohan under U.S.S.G. § 2F1.1 (fraud and deceit), as "the most analogous offense guideline." The court stated:

> Fraudulently and deceitfully the defendant changed his name to Desiderio and changed his corporation to Donateco, Inc. and set up a commodity futures sales office in Florida employing four to six sales persons who made between 750 and 1,000 or more cold canvass [sic] calls, soliciting potential investors to invest a minimum of $3,000 each through Donateco, Inc. [E]ach such solicitation was a fraudulent and deceitful violation of the Court's order.

Lohan was sentenced to 37 months imprisonment, a $200,000 fine, a five-year supervisory release term, and a special assessment of $50.00.

## II

■ Lohan argues for the first time on appeal that the imposition of a sentence of more than six months, after the first order to show cause had specified that term as the maximum punishment and without any justification by the government for seeking a greater sentence in the subsequent orders to show cause, denied him due process in violation of the Fifth Amendment. We hold, however, that the imposition of a sentence of more than six months following Lohan's guilty plea to the final contempt charge, did not violate his constitutional rights.

The November 1989 order, which contained the six months' limitation, expired on January 4, 1990, when Lohan failed to appear at the hearing the order directed to be held on that date. The superseding

March 1990 order contained substantially the same allegations of contempt and fraud as the earlier order, but did not include the six months' sentence limitation. Lohan was arrested by the federal authorities pursuant to that latter order, and it was that order which formed the basis of the subsequent plea bargaining between Lohan and the government that resulted in Lohan's guilty plea to the June 1990 order to show cause.

Prior to Lohan's 1990 guilty plea, the court informed him that he could be sentenced to more than six months on that guilty plea and Lohan indicated his awareness of that fact. If Lohan wished to challenge the increased penalty possible under the later orders to show cause, he should have attacked those later orders on that ground or sought a jury trial on the charges, to which the court informed him he was entitled.

Lohan argues that "after appellant had been arrested on the original application and retained counsel, the Government unilaterally determined to seek greater punishment than its original order to show cause called for," and that "the prosecution's efforts to broaden the basic punishment applicable to appellant's case after a change in Judges smacks of prosecutorial vindictiveness."

Nothing in the record justifies this charge. Since Lohan never objected to any of the superseding orders on this ground, no record was developed regarding the government's reason for seeking a higher sentence.

As noted, federal authorities arrested Lohan under the March 1990 order, which did not limit imprisonment to six months. Thus, the government's change in position did not come after, or in response to, Lohan's exercise of any pre-trial right. "[A] presumption of prosecutorial vindictiveness does not exist in a pre-trial setting." *United States v. Hinton*, 703 F.2d 672, 678 (2d Cir.), *cert. denied*, 462 U.S. 1121, 103 S.Ct. 3091, 77 L.Ed.2d 1351 (1983) (citing *United States v. Goodwin*, 457 U.S. 368, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982)). The fact that a prior order to show cause, issued while

Lohan was a fugitive from justice, exposed Lohan to a lesser punishment, does not even suggest prosecutorial vindictiveness in seeking a longer sentence in a subsequent order.

■ Lohan also argues that "in order for the Government to have changed the penalty provision of its application against a different judge, the Government was required to present additional information justifying its proposed modification." He cites *United States v. Zingaro*, 858 F.2d 94 (2d Cir.1988), for this proposition. The issue in *Zingaro*, however, was whether the prosecution's introduction of evidence relating to an issue not specified in the indictment constituted a constructive amendment of the indictment. This court held that there had been a constructive amendment, which was *"per se* violative of the grand jury clause of the fifth amendment" since the " 'very purpose of the requirement that a man be indicted by grand jury is to limit his jeopardy to offenses charged [by the grand jury].' " *Id.* at 98 (quoting *Stirone v. United States*, 361 U.S. 212, 218, 80 S.Ct. 270, 274, 4 L.Ed.2d 252 (1960)).

In this case, however, the government elected to prosecute Lohan for criminal contempt by an order to show cause, rather than by indictment. Therefore, the grand jury clause is not implicated. Lohan himself recognizes that "no case has held that due process requires an indictment to prosecute an individual for a serious criminal contempt punishable by imprisonment in excess of six months...."

### III

Lohan's other challenges to his sentence relate to the Sentencing Guidelines. He contends (A) that because the April 1987 injunction was issued before the Guidelines became effective on November 1, 1987, the district court should not have applied the Guidelines at all and that their application to his case violated the *ex post facto* clause of the Constitution; that if the Guidelines do apply, the district court improperly (B) enhanced his sentence based on the amount

of loss of the victims of his crimes and (C) fined him $200,000.

■ **A.** The crime for which Lohan was convicted, and to which he pleaded guilty, was not the conduct which led to the April 1987 injunction, but his continuing violations of that injunction from July 1987 through 1988. The Guidelines apply to that crime, and their application to it did not constitute an *ex post facto* application of the law. *Cf. United States v. Story*, 891 F.2d 988 (2d Cir.1989) (Guidelines apply to "straddle" crimes which begin before the effective date of the guideline but continue past the effective date).

■ Lohan asserts that the "guidelines should not have been applied in this particular case because the contempt charged was a unique crime requiring individualized sentencing to be left within the discretion of the Court." The Guidelines themselves, however, recognize and provide for their application to criminal contempt. *See* U.S.S.G. §§ 2J1.1 (contempt) and 2X5.1 (other offenses). It is not the function of the courts to create exceptions from the Guidelines for contempts that are "unique" crimes. Moreover, in view of the court's statement at the sentencing hearing, the "individualized sentencing" that Lohan seeks might well have resulted in a more severe sentence:

> [The sentence computed pursuant to the Guidelines of] 37 months scarcely seems adequate to the Court given all the facts that the Court has heard....
>
> As I indicated, if I am incorrect with the analogous guideline, I will impose a minimum of five years and very likely more, if I was not governed by the guidelines.

■ **B.** Alternatively, Lohan argues that if the Guidelines do apply, the district court misapplied them in its enhancement of his sentence to reflect the losses of his victims.

The Guidelines do not directly specify the appropriate sentences for criminal contempt, but direct the district court to apply the provisions governing the most analogous substantive offenses. The district court concluded that the most analogous offense for the criminal contempt Lohan committed was fraud and deceit, which is dealt with in § 2F1.1 of the Guidelines. Lohan does not here challenge that determination.

Section 2F1.1 contains a table directing an increase in the offense level based on the amount of "the loss." Prior to November 1, 1989, the offense level was to be increased by nine if the loss was between one million and two million dollars. *See* U.S.S.G. § 2F1.1(b)(1)(J) (Nov. 1987). On that date, however, the loss tables were amended "to increase the offense levels for offenses with larger losses to provide additional deterrence and better reflect the seriousness of the conduct...." *See* United States Sentencing Commission, *Guidelines Manual*, Appendix C, at C. 78–79 (Nov. 1990). Under the amended tables, the minimum loss for a nine-point enhancement was an amount more than $350,000.

The district court applied the earlier table and the government supports that ruling. Lohan urges that the November 1, 1989 table applies. It is unnecessary to resolve that dispute, however, since we conclude that under either standard the district court properly increased Lohan's sentence by nine levels on the basis of the losses of the victims of his fraud.

The district court agreed with the recommendation in the presentence report of a nine-level increase. Relying on the evidence presented at the *Fatico* hearing, the court stated:

> Fraudulently and deceitfully the defendant changed his name to Desiderio and changed his corporation to Donateco, Inc. and set up a commodity futures sales office in Florida employing four to six sales persons who made between 750 and 1,000 or more cold canvass [sic] calls, soliciting potential investors to invest a minimum of $3,000 each through Donateco, Inc. [E]ach such solicitation was a fraudulent and deceitful violation of the Court's order. Because some acceptances of the solicitations were less than $3,000 the probation department[ ] conservatively made an adjustment under

2F1.1BJ, or added nine levels for this part of the offense.

This Court finds under the circumstances this adjustment was conservative, proper and correct.

Lohan challenges this determination on the ground that at the *Fatico* hearing the government established that the actual loss of Lohan's victims was only $87,000, and that this amount was the measure of the "loss" his crimes caused. We agree with the district court, however, that under § 2F1.1 actual loss is not the touchstone for enhancing a sentence to reflect the victims' "loss."

The commentary to § 2F1.1 regarding determination of loss states:

> 7. ... In keeping with the Commission's policy on attempts, if a probable or intended loss that the defendant was attempting to inflict can be determined, that figure would be used if it was larger than the actual loss. For example, if the fraud consisted of attempting to sell $40,000 in worthless securities, or representing that a forged check for $40,000 was genuine, the "loss" would be treated as $40,000 for the purposes of this guideline.
>
> 8. The amount of loss need not be precise. The court is not expected to identify each victim and the loss he suffered to arrive at an exact figure. The court need only make a reasonable estimate of the range of loss, given the available information. The estimate may be based on the approximate number of victims and an estimate of the average loss to each victim, or on more general factors, such as the nature and duration of the fraud and the revenues generated by similar operations....

U.S.S.G. § 2F1.1, Application Notes 7–8.

Under the Guidelines "loss" "may consist of the 'probable' loss resulting from the fraud." *United States v. Brach*, 942 F.2d 141 (2d Cir.1991) (citing *United States v. Haddon*, 927 F.2d 942, 951–52 (7th Cir. 1991) and *United States v. Davis*, 922 F.2d 1385, 1392–93 (9th Cir.1991)). *See also United States v. Schneider*, 930 F.2d 555, 558 (7th Cir.1991) (" 'loss' within the meaning of the Guidelines includes intended, probable, or otherwise expected loss"); *United States v. Davis*, 922 F.2d at 1392 ("for purposes of sentencing a convicted criminal for attempted fraud under sections 2F1.1 and 2X1.1 of the Guidelines, the term 'probable' loss refers ... to the amount of loss that the victim probably would suffer, assuming the attempt did succeed.").

The district court found that Lohan's salesmen "made between 750 and 1,000 or more cold canvass [sic] calls, soliciting potential investors to invest a minimum of $3,000 each through Donateco, Inc." This finding is fully supported by the evidence at the *Fatico* hearing, and is not clearly erroneous. Had all these telephone solicitations succeeded, Lohan would have obtained between $2,250,000 and $3,000,000.

Through these solicitations, Lohan was "attempting to inflict" upon his victims a "probable or intended" loss of that amount. That loss, which the presentence report "conservatively" reduced to one million to two million dollars, fully justified the district court's nine-level enhancement of Lohan's sentence.

C. Although Lohan also challenges the $200,000 fine, he does so "for the same reason" that he attacks the length of his imprisonment. He does not make any independent argument about the fine, and has not shown that the fine is improper.

## IV

In its cross-appeal, the government originally argued that the district court had erred in failing (1) to increase the sentence to reflect Lohan's 1987 New York State conviction and (2) to order Lohan to make restitution to his victims. Subsequent to oral argument, however, the government by letter to the court stated that it "hereby withdraws that portion of its appeal which seeks an order of restitution". It stated that it took that action because it wished to eliminate any question whether the district court's failure to inform Lohan at the sentencing hearing that he could be required to make restitution rendered his guilty plea involuntary—an issue that the court had

raised at oral argument, although not covered in the briefs. Accordingly, we address only the state criminal conviction issue.

Section 4A1.1 of the Guidelines requires that two points be added in determining the criminal history category for each prior sentence of imprisonment of at least sixty days (Subsection (b)) and an additional two points "if the defendant committed the instant offense less than two years after release from imprisonment on a sentence counted under (a) or (b)." U.S.S.G. § 4A1.1(e). It is undisputed that Lohan's 1987 New York State conviction for grand larceny and securities fraud, for which he was sentenced to 90 days imprisonment, met both of the foregoing conditions for increasing his criminal history category.

Under the Guidelines Sentencing Table (Chapter 5, Part A), the four additional points to be added pursuant to those requirements would place Lohan in criminal history category III, rather than the category I in which the district court placed him. The district court calculated Lohan's offense level at 21. At that level, the Guidelines sentencing range for someone in category III was 46–57 months, as against the 37–46 months for a category I offender.

Although the original presentence report had recommended treating Lohan as a category III offender, an amended report, which the government had not seen prior to the sentencing hearing, treated him as a category I offender. The amended report explained that it did not include the New York State conviction "to avoid double counting," because "the facts in this case are a part of the $130,000 fraud loss involved in the conduct upon which the April 1987 injunction was based."

Over the government's objection, the court accepted the amended presentence report's criminal history computation, and sentenced Lohan as a level 21 offender, criminal history category I. The court did not explain its reasoning, noting only that "[t]he probation department has made a determination and I agree with it that it is a level one."

We agree with the government that the court erroneously excluded Lohan's New York conviction.

Contrary to the amended presentence report's conclusion, the facts in the present case are not "a part of the $130,000 fraud loss" resulting from the conduct that led to the 1987 injunction. As the government correctly points out, the New York conviction punished Lohan for his pre-injunction activities, while "Lohan's violation of the 1987 injunction constitutes an element of his *present* criminal conduct, not an element of his criminal history" (emphasis in original). Although Lohan's fraudulent activity prior to April 1, 1987 was the basis for both the injunction and the New York State criminal conviction, it was not the basis for the criminal contempt for which he was sentenced in the present case and was not included in the offense level computation.

The contempt conviction is based upon Lohan's conduct subsequent to and in violation of the injunction. Accordingly, there would be no double counting if the New York State conviction, based as it was upon different conduct from that underlying the present civil contempt conviction, were included in determining Lohan's criminal history category. The district court erred in not including the New York State conviction in determining Lohan's sentence.

## V

The sentence of the district court is affirmed insofar as it exceeded six months, was based upon the Sentencing Guidelines and determined that Lohan was a level 21 offender. The sentence is vacated insofar as it treated Lohan as in criminal history category I, and the case is remanded to that court to resentence Lohan as a criminal history category III offender.

So ordered.