24-2239
*United States v. Dagar*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

### SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 5th day of September, two thousand twenty-five.

PRESENT:
> RICHARD J. SULLIVAN,
> JOSEPH F. BIANCO,
> STEVEN J. MENASHI,
> *Circuit Judges.*

_____

UNITED STATES OF AMERICA,

> *Appellee*,

> v.                                                                  No. 24-2239

AMIT DAGAR,

> *Defendant-Appellant*,

ATUL BHIWAPURKAR,

*Defendant.**

_____

| | |
|---|---|
| **For Defendant-Appellant:** | SELBIE L. JASON (Patrick J. Smith, Michael K. Sala, *on the brief*), Clark Smith Villazor LLP, New York, NY. |
| **For Appellee:** | JUSTIN V. RODRIGUEZ (James Ligtenberg, *on the brief*), Assistant United States Attorneys, *for* Jay Clayton, United States Attorney for the Southern District of New York, New York, NY. |

Appeal from a judgment of the United States District Court for the Southern District of New York (Andrew L. Carter, Jr., *Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the August 21, 2024 judgment of the district court is **AFFIRMED**.

Amit Dagar, a former programmer at Pfizer, Inc. ("Pfizer") who participated in the development of the drug Paxlovid, appeals from a judgment of conviction following a jury trial in which he was found guilty of securities fraud in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2, and conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, in connection with his

---

* The Clerk of Court is respectfully directed to amend the caption as set forth above.

2

purchase of Pfizer stock options before the public learned that the pill was overwhelmingly effective in the treatment of COVID-19. We assume the parties' familiarity with the underlying facts, procedural history, and issues on appeal, to which we refer only as necessary to explain our decision below.

## I. Constructive Amendment

Dagar first contends that the government violated his Fifth Amendment rights when it presented a theory of guilt at trial that constructively amended the charges against him in the superseding indictment. *See United States v. Salmonese*, 352 F.3d 608, 621 (2d Cir. 2003). "To prevail on a constructive amendment claim, a defendant must demonstrate that either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was subject to the grand jury's indictment." *United States v. Frank*, 156 F.3d 332, 337 (2d Cir. 2009). Where the defendant has shown that he "might have been . . . convicted on a charge the grand jury never made against him," an indictment will be deemed to have been constructively amended, and the defendant's conviction will be reversed. *Stirone v. United States*, 361 U.S. 212, 219 (1960).

Dagar argues that the superseding indictment espoused the theory that he traded on material non-public information ("MNPI") consisting of his knowledge that positive results from the Paxlovid trial would be announced the following day. In particular, the indictment opens with an allegation that "[i]n or about November 2021, [Dagar] . . . participated in an insider trading scheme . . . based on [MNPI] . . . about clinical trials of Paxlovid, a drug treatment for COVID-19." App'x at 34. It then provides the more specific "example" of how "[o]n or about the morning of November 4, 2021, D[agar]'s supervisor . . . sent [him] . . . electronic message[s] that indicated, in sum, that [he] had learned the outcome of the drug trial, that the results were positive, that D[agar] should prepare for some hard work ahead, and that a press release would be issued the next day." *Id.* at 35. The indictment repeatedly references these November 4 messages. *See id.* at 38 (quoting messages); *id.* at 39 (describing purchases made "[f]ollowing the communications described above").

In its opening statement at trial, the government directed the jury's attention to those messages, previewing for the jury that they would learn how Dagar's supervisor mistakenly received an email stating the trial had been successful, that the supervisor then messaged Dagar about it, and that Dagar made a series of stock

4

option purchases consistent with those positive results before advising a coworker to do the same. During the trial, the government introduced evidence that the messages – which stated "we got the outcome," "lot of work lined up," and "press release tomorrow" – tipped Dagar off to how Paxlovid had been found to be overwhelmingly effective. *Id.* at 288–89. In addition, the government offered evidence that Dagar had knowledge of confidential protocols and recent milestones that, when considered in tandem with the impending press release, further supported the conclusion that Pfizer's stock price would increase. In particular, Dagar knew that Pfizer had contemplated four possible "outcomes" depending on the trial's success, including: (1) stopping the trial if the results showed the drug's "overwhelming efficacy"; (2) continuing the trial if the results were favorable but not overwhelmingly so; (3) adjusting the trial's sample size if the results were inconclusive; or (4) stopping the trial altogether because further testing would be futile. In its summation, the government again highlighted the November 4 messages, but also stressed that "[e]ven if the defendant did not know for *certain* that the results were [']*overwhelming efficacy*[']," he would still be guilty because he "knew that [Paxlovid] cleared the safety milestone and the proof of concept assessment," that "the [Data Monitoring Committee] had met the night

5

before . . .[,] and that there was only one possible outcome of four." App'x at 194 (emphasis added).

Dagar insists that the government's summation introduced an entirely new theory on which the jury could convict him of insider trading. We disagree. The superseding indictment provided Dagar with ample "notice of the core of criminality to be proven at trial" – namely, that he purchased Pfizer options based on the positive results of the Paxlovid trial before they were made public. *United States v. Rigas*, 490 F.3d 208, 228 (2d Cir. 2007) (emphasis and internal quotation marks omitted). This is true regardless of whether Dagar knew for certain that the results showed "overwhelming efficacy," or he surmised as much from his background knowledge about the clinical trial's progress and the messages' reference to a press release. Although Dagar characterizes the latter as an alternative theory distinct from that alleged in the indictment, we have never found constructive amendment in a securities fraud case when the government simply demonstrated the different ways in which a defendant might have interpreted the MNPI he possessed.

Contrary to Dagar's assertions, this case is not at all like *United States v. Zingaro*, 858 F.2d 94 (2d Cir. 1988). In that case, we found that the government

6

constructively amended an indictment, which had alleged only a conspiracy in connection with loan-sharking and gambling at social clubs in Yonkers, by introducing evidence related to a loan unconnected to those clubs. *See id.* at 100–03. Here, by contrast, all the MNPI that the government attributed to Dagar at trial was closely related to – and, indeed, part of – the specific charges in the indictment. Dagar strains to explain how "the superseding indictment gave [him] 'no inkling that he was'" — in fact — "'charged with [insider trading] unrelated' to the alleged [MNPI] he received on November 4, 2021." Br. at 31 (quoting *Zingaro*, 858 F.2d at 103). While it is true that the government introduced evidence that Dagar "had a lot of [MNPI] about Paxlovid because of his job at Pfizer," App'x at 183, this evidence was clearly offered to provide "context" concerning Dagar's state of mind when he received the messages from his supervisor on November 4. *See id.* at 191–92. The government never pursued a theory that Dagar traded on information he possessed before that date. Moreover, the grand jury charged Dagar with "participat[ing] in an insider trading scheme . . . based on [MNPI] . . . about clinical trials of Paxlovid" that culminated with his receipt of the November 4 messages. *Id.* at 34. We see no daylight between the proof introduced at trial and the "conduct that was subject to the

7

grand jury's indictment." *Frank*, 156 F.3d at 337. Even if not "specifically pleaded in the indictment," that evidence is "plainly within the charged core of criminality." *Salmonese*, 352 F.3d at 621.

For all these reasons, and in light of the "significant flexibility" we afford the government in presenting its case, *Rigas*, 490 F.3d at 228, we reject Dagar's argument that the superseding indictment was constructively amended at trial.

## II. Venue

Dagar also argues that the government failed to meet its burden to prove, by a preponderance of the evidence, that venue was proper in the Southern District of New York. *See United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011). We review the sufficiency of evidence supporting venue *de novo* while "considering the evidence in the light most favorable to the government." *United States v. Davis*, 689 F.3d 179, 185 (2d Cir. 2012). As relevant here, the Securities Act of 1934 provides that venue is appropriate "in the district wherein any act or transaction constituting the [criminal] violation occurred." 15 U.S.C. § 78aa; *see also* 18 U.S.C. § 3237(a) (providing for venue "in any district in which such [an] offense was begun, continued, or completed").

8

We specifically held in *United States v. Chow* that where, as here, "the defendant is charged with an offense involving the trading of securities on a stock exchange located in the [Southern District of New York]," such as the Nasdaq, "venue in that district is appropriate." 993 F.3d 125, 143 (2d Cir. 2021). We acknowledged in *Chow* that "the N[asdaq] is an electronic exchange" without a physical trading floor and that "no witness was able to say with certainty whether its servers that execute trades were located in New York or New Jersey." *Id.* at 133. Nevertheless, we concluded that the unknown location of the servers was not dispositive, or even particularly relevant, since the evidence demonstrated that "the Southern District of New York is the district in which the N[asdaq] is located, where the shares of [the] stock were listed and traded, where the brokers for the sellers in a significant number of [the] share purchases were located, and where [the] purchases of [the] shares were executed, cleared, and recorded." *Id.* at 143.

Here, there is no question that Dagar and his co-conspirator traded on Nasdaq exchanges, that Dagar purchased options from a broker that has a registered address in Manhattan, and that the trades were cleared and settled in part by a Manhattan-based firm on its mainframe computer located in Poughkeepsie, New York, which is also within the Southern District of New York.

9

In fact, the government introduced expert testimony from the very same witness who testified in *Chow* that the relevant stock options here, like in *Chow*, were traded on options markets operated by the Nasdaq, which is headquartered in Manhattan, *see* App'x at 149–50, and that clearing and settling are "[a]bsolutely" a necessary part of a stock option trade, *id.* at 160. *See Chow*, 993 F.3d at 133–34 (describing the same witness's testimony that the stock was "traded on the N[asdaq] . . . headquartered in Manhattan," that the seller also used "clearing services . . . in Manhattan," and that those clearing services were "absolutely necessary parts of any trade" (alterations accepted and internal quotation marks omitted)). We have previously held that trades that "utilize[] the facilities of any New York based . . . brokerage firm" are sufficient to establish venue. *United States v. Geibel*, 369 F.3d 682, 697 (2d Cir. 2004). To the extent Dagar argues that the registered address does not suffice to show that his broker purchased options on his behalf from Manhattan, "[v]enue," like other matters, "may be proved by circumstantial evidence." *United States v. Lange*, 834 F.3d 58, 69 (2d Cir. 2016). Under *Chow*, and considering our deferential standard of review, this evidence plainly suffices to show by a preponderance of the evidence that venue was appropriate in the Southern District of New York.

10

Dagar's other argument, that one of the brokerage firms he used (Fidelity) may have placed his trades on the Nasdaq from Rhode Island, is equally unavailing. Whether some trades were placed from New Jersey or Rhode Island, the evidence at trial clearly permitted the jury to conclude by a preponderance of the evidence that the exchange on which Dagar traded was in Manhattan, that he used a Manhattan-based broker, that almost all his trades were cleared and settled in part by Manhattan-based firms, and that those services were rendered within the Southern District of New York. Under the law of this Circuit, that is enough to establish venue. *See, e.g., United States v. Buyer*, No. 23-7202, 2025 WL 855773, at *5 (2d Cir. Mar. 19, 2025) ("[Defendant] traded on the New York Stock Exchange[,] . . . headquartered in SDNY, which supports venue."); *United States v. Riley*, 638 F. App'x 56, 62 (2d Cir. 2016) (finding venue when the defendant "could have foreseen that the trading . . . would occur in the Southern District of New York, given that [the company]'s shares were publicly traded on N[asdaq], located in Manhattan").

Dagar finally contends, in the alternative, that the government failed to demonstrate that he possessed the requisite state of mind to establish venue. We disagree. As the district court instructed the jury, "[v]enue is proper in a district

11

where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur . . . or (2) it is foreseeable that such an act would occur." App'x at 224; *see also United States v. Svoboda*, 347 F.3d 471, 493 (2d Cir. 2003).

At trial, the government introduced evidence that Dagar had about twelve years' experience trading options, that he made more than 7,000 trades over a six-year period, that Dagar himself described his trading experience as extensive, and that he knew his brokerage firm was a member of the New York Stock Exchange. As in *Chow*, the jury had ample evidence from which to conclude that, at the very least, Dagar was a "savvy investor [who] could reasonably foresee that trades likely would be executed on [an] exchange" like the Nasdaq. 993 F.3d at 143 (internal quotation marks omitted); *see also United States v. Khalupsky*, 5 F.4th 279, 292 (2d Cir. 2021) (considering a trader's "expertise" as part of venue determination); *Riley*, 638 F. App'x at 62. On this record, the jury was justified in concluding that the offenses of conviction were "begun, continued, or completed" in the Southern District of New York. 18 U.S.C. § 3237(a).

\* \* \*

12

We have considered Dagar's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court